Lura Mars **WALLACE**, Administratrix of the
Estate of Ronald Poitras, Deceased,
Appellant,

v.

**STATE** of Alaska, Appellee.

No. 2683.

Supreme Court of Alaska.

Dec. 29, 1976.

William M. Erwin, Anchorage, for appellant.

Sanford M. Gibbs, Anchorage, for appellee.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR and BURKE, Justices.

OPINION

BURKE, Justice.

The issue raised by this appeal is whether the State of Alaska can be held liable for a workman's death when state inspectors discovered the safety violation which was the cause of death but failed to take any action on it. In this case, the trial court granted the state's motion for summary judgment, concluding that persons in the position of safety inspectors should not be held liable when they fail to discover violations of safety rules or, having discovered violations, fail to enforce the law against them. Our recent decision in *Adams v. State* [1] controls the issues raised in this case, and the superior court's order is reversed.

On April 19, 1972, Ronald Poitras was electrocuted while working on the installation of a water main pipe near Tudor Road in the Muldoon area of Anchorage. Poitras was a pipe layer on the installation project, and it was his job to guide the sixteen inch pipe into a trench which had been excavated to encase it. During this maneuver, the operator of a Koehring "1066" backhoe, which has a twenty foot boom, would lift the pipe from its storage position and lower it into the trench. Poitras stood above the trench and guided the pipe into position. When, on the day of the accident, the boom of the backhoe hit or came into close contact with a high voltage utility wire owned by Chugach Electric, the boom was immediately electrified.[2] In turn, the steel cable which held the pipe and the pipe itself were electrified, and Poitras, who was guiding the pipe, was electrocuted.

During the thirty days that the job had been under way, state safety inspectors had visited the installation site on at least seven different occasions. Jorge C. Hix, at that time the Director of Occupational Safety for the State of Alaska, and Robert Smith, the Assistant Commissioner of Labor, had each visited the job at least twice, and three other inspectors had been on the site once. Prior to the accident, the state inspectors who were on the site had enforced the General Safety Code, promulgated by the State Department of Labor; the job had been shut down once because no oiler was there to supervise,[3] and on another occasion, men had been ordered out of the trench being excavated until it could be widened. Although city inspectors were almost constantly present on the site, they did not regulate safety conditions; they merely monitored the work to insure the correct installation of the pipe. When an unsafe working condition was noticed by an inspector for the city, he would then contact the state safety inspectors to take action on it.

On April 17, 1972, two days before Ronald Poitras' death, Doug Wahto, a state inspector on this job, noticed that the boom of the backhoe was coming within ten feet of the Chugach high voltage power line, in violation of the General Safety Code. He asked Gale Fowler, the backhoe operator, if Fowler realized that he was in violation of the Safety Code, and when Fowler replied affirmatively, Wahto warned him of the dangers of such a violation. Wahto also instructed Fowler to store the pipes on the side of the trench farthest from the high tension line, to minimize the possibility of contact with the line when the backhoe moved the pipe from its storage position into the trench. Wahto filled out a report on this inspection,

1. 555 P.2d 235 (Alaska 1976).

2. There is conflicting evidence as to whether the boom of the crane actually came into contact with the Chugach line or merely was sufficiently close to cause electricity to arc to the boom.

3. The oiler's duties include acting as a safety observer; he watches the machine to prevent anything from interfering with it, and he observes the workers in the ditch.

and when he returned to his office, he discussed the situation with Jack Garrett, the Senior Safety Inspector. Gale Fowler, operator of the backhoe, stated in his deposition that "a couple of times" he had been instructed by state inspectors to "watch the lines." Melvin Reynolds, the oiler on the job, stated that the boom of the backhoe came within eight to twelve feet of the high tension line every time a piece of pipe was lifted. Other than the oral warnings given to Fowler by Wahto, no action was taken to stop the hazardous operation of the backhoe before Poitras was killed. There were no state inspectors at the job site on the day of the accident.

On April 19, 1973, Lura Mars Wallace, administratrix of the estate of Ronald Poitras, filed a wrongful death action against the State of Alaska, as well as other defendants. The State moved to dismiss the complaint, and, after the first of two hearings on the matter, requested that the superior court treat the motion as one for summary judgment, based on the pleadings, affidavits, and depositions in the case. On August 4, 1975, the trial court granted the motion for summary judgment, and it is from that judgment that Wallace appeals.

The issue in this case is identical to the one confronted by this court in *Adams v. State*: whether the state is liable for a failure to enforce safety regulations once it has undertaken an inspection and has discovered safety violations in the course of that investigation. In analyzing this question in *Adams*, we considered three factors:

> . . . whether the state had a duty to take some action with regard to the Gold Rush; whether the state's duty, if any, was owed to the plaintiffs or their decedents; and whether the state, if liable under the first two requirements, is nonetheless immunized by AS 09.50.250, because the actions or inaction complained of were discretionary.[4]

This three-part analysis is equally applicable in the case before us now.

### I. The State's Duty to Act

After concluding that preventable accidents were the leading cause of death in the state,[5] the legislature delegated to the Alaska Department of Labor the responsibility for industrial safety.[6] Pursuant to this authority, the Alaska Department of Labor promulgated the General Safety Code (revised June 1969), and sec. 312–20 of that code provided:

> The operation of shovels, all-purpose cranes and drag-lines when it is possible to bring any part of the equipment within ten (10) feet of high tension lines is prohibited, except when such high voltage lines have been effectively guarded. Whenever it is necessary to move the shovel under electric wires, ample clearance shall be provided, together with such precautions as may be necessary to prevent contact between any part of the shovel and the wires.

The State Department of Labor was given the authority to enforce all state labor

---

4. 555 P.2d at 239–40.

5. Prior to amendment in 1973, AS 18.60.010 provided:
   *Legislative intent.* (a) The legislature finds that preventable accidents are the leading cause of death in the state, that accidents cause nearly one-fourth of all deaths of the white race in the state and as much as 82 per cent of all deaths in certain age groups; that the proportion of accidental deaths to all deaths is three times as high in the state as in other parts of the United States where intensive accident prevention campaigns

are conducted; and that an unknown but proportionately as great a rate of nonfatal accidents is sustained in the state.
   (b) For these reasons it is found and declared necessary to undertake a program to reduce the incidence of preventable accidents in the state.

6. Prior to amendment in 1973, AS 18.60.020 provided:
   *Rules and regulations.* The Department of Labor may issue the orders, rules and regulations necessary to carry out the purposes of §§ 10–100 of this chapter.

laws [7] and to make inspections for the enforcement of those laws.[8] The Commissioner of Labor had a specific duty to give employers written notice of any discovered violations of the General Safety Code which created a serious hazard to the safety of the employees at the site.[9] The Commissioner also had the authority to close a site and have employees removed from it until the unsafe condition could be corrected.[10]

■ In *Adams,* we did not treat the issue of whether state fire officials had a statutory duty to remedy safety hazards discovered at the Gold Rush Hotel. Instead, we found that by undertaking the inspection, the state voluntarily assumed a common law duty to do so with care. We further held that once safety violations were discovered and informally discussed with the Gold Rush management, "the state fire officials had a duty to proceed further with regard to the recognized hazards." [11] In the case before us now, the State Department of Labor, by conducting safety inspections of the pipe installation site, voluntarily assumed a duty to use due care in attempting to remedy the unsafe condition discovered in the course of inspection.

■ We do not determine at this time whether the state breached its duty to take steps to abate the hazardous operation of the backhoe. There did, however, exist in this case a course of action for the state officials to pursue which might have averted the result of the dangerous condition. The Department of Labor had the statutory authority to enforce the General Safety Code, and the Commissioner of Labor was specifically authorized to close down sites as a means of enforcing the Code. In fact, this method of enforcement had already been employed on the site. State safety inspectors had previously closed the installation project because no oiler was on the job and, on another occasion, had ordered men from the trench where the pipe was being laid, until it could be widened. The safety hazard of operating the backhoe in close proximity to the high voltage line would have easily been corrected by placement of a high tension barrier over the lines, protecting the backhoe's boom from electrification. However, the reasonableness of the state's failure to attempt to correct the hazardous situation within two days of its discovery, other than by warning the backhoe operator, remains a question for the trier of fact.

II. Duty to the Plaintiff's Decedent

In analyzing whether the state's common law duty was owed to the plaintiff and her decedent, we look to the purpose of the inspection.[12] In the instant case, Poitras, a workman, was certainly the intended beneficiary of the safety inspections conducted by the Department of Labor and the foreseeable victim of the uncorrected safety hazard. This is especially apparent in light of the stated legislative purpose to reduce the incidence of deaths caused

7. AS 23.05.060 provides in part:
   The department may
   (1) enforce all state labor laws;

   .    .    .    .    .

8. AS 23.05.100 provides in part:
   The department may
   (2) make inspections for the proper enforcement of all state labor laws;

   .    .    .    .    .

9. Prior to amendment in 1973, AS 18.60.075
   (b) provided:
   If the commissioner of labor determines that the condition of an employment site or part of the site creates a serious hazard to the safety of the employees at the site,

he shall give written notice of the section of the General Safety Code which has been violated to the employer. After notice is given the commissioner of labor may order the employment site or part of the site closed and the employees removed from it until the condition is corrected. Employees shall be permitted on the employment site to correct the unsafe condition.

10. *Id.*

11. 555 P.2d at 240.

12. *Adams v. State,* 555 P.2d 235, 241 (Alaska 1976) and cases cited therein at n. 12.

by preventable work-related accidents.[13] Therefore, Poitras was a member of the class to whom the state specifically owed a duty.

### III. The Discretionary Function

■ Although the decision to inspect a site is a discretionary act, the negligent performance of that inspection is a ministerial function and thus not immune.[14] Since it was the failure to follow up on the inspection which formed the basis of Wallace's complaint, not the initial decision to inspect, the state would not be immune from liability on the theory that its actions or inaction could be characterized as a discretionary function.

■ In our consideration of the policy implications of a denial of immunity in *Adams,* we noted that there sometimes exists a possibility that imposition of liability for negligent inspection might deter the state from undertaking inspections at all. The state in this case has argued that a finding of liability on its part would encourage safety inspectors to avoid inspecting work sites in the future, in order to protect themselves from liability. In this context, the state has also contended ·that once a violation has been detected, the spectre of liability would require an inspector to be present on a construction site at all times to insure that it did not recur. This policy argument is not persuasive, given the sweeping revision of Title 18, making mandatory the enforcement of safety regulations in most instances.

The 1973 amendments to Title 18 established a division of occupational safety and health within the State Department of Labor,[15] and authorized state OSHA inspectors to make unannounced inspections of virtually any establishment.[16] If any employee in the state so requests, the state inspectors have a mandatory duty to inspect the site requested, as long as they have reasonable grounds to believe a safety violation exists on that site.[17] If a violation is discovered upon inspection, the Department of Labor must issue a citation and fix the time for abatement of the hazard.[18] Furthermore, once a citation

13. *See* AS 18.60.010(a), *supra* n. 5.

14. *Adams v. State,* 555 P.2d 235, 244 (Alaska 1976).

15. AS 18.60.055 provides:
*Division of occupational safety and health.* There is established in the department a division of occupational safety and health to be administered by a director responsible to the commissioner. Minimum qualifications shall be established for employees of the department acting as safety inspectors. These qualifications shall include, as a minimum requirement, at least five years general work experience in the field they are assigned to inspect.

16. AS 18.60.083(a)(2) provides:
(2) inspect and investigate during regular working hours and at other reasonable times, and with reasonable limits and in a reasonable manner, a place of employment and all pertinent conditions, structures, machines, devices, equipment and materials, and to question privately an employer, owner, operator, agent or employee.

17. AS 18.60.088 provides in part:
*Employee requests for special inspection.* (a) An employee or a representative of employees who believe that a violation of a safety or health standard exists that threatens physical harm or that an imminent danger exists, may request an inspection by giving notice of the violation or danger to the department. The notice shall be in writing and set out with reasonable particularity the grounds for the notice and be signed by the employee or the representative of the employees. If, upon receipt of the notice, the department determines that there are reasonable grounds to believe that a violation or danger exists, the department shall make a special inspection as soon as practicable. If the department determines there are no reasonable grounds to believe that a violation exists, the department shall notify in writing the employee or the representative of the employees of that determination.

18. AS 18.60.091, provides in part:
*Citations.* (a) If, upon inspection or investigation, the department believes that an employer has violated a provision of §§ 10–105 of this chapter that is applicable to the employer, the department shall with reasonable promptness issue a citation to the employer. Each citation shall be in writing

has been issued, the Department must notify the employer of the proposed penalty for the violation; if the employer does not appeal this penalty to the OSHA review board within fifteen days, then the citation and penalty become final and non-reviewable.[19] Finally, the duties of the Department of Labor have been changed to include mandatory enforcement of occupational safety and health standards which are at least as stringent as those promulgated by the U.S. Secretary of Labor pursuant to the Federal O.S.H.A.[20] The statute itself now specifically prohibits placement of equipment near electrical power lines [21] unless a warning sign is posted and barriers are installed to protect the equipment from being electrified.[22] Because the statute now imposes upon the state a duty to enforce the safety provisions once violations have been discovered, the state's policy argument for retaining its immunity is moot.

and shall describe with particularity the nature of the violation, including reference to the provisions of the chapter or any order, rule or regulation alleged to have been violated, and shall fix a reasonable time for abatement of the violation. The department may prescribe procedures for the issuance of a notice instead of a citation with respect to minor violations which have no direct or immediate relationship to safety or health.

19. AS 18.60.093 provides in part:
*Enforcement procedures.* (a) If, after an inspection or investigation, the department issues a citation, the commissioner shall, at a reasonable time after the termination of the inspection or investigation, notify the employer by certified mail of the penalty proposed to be assessed and that the employer has 15 working days within which to notify the commissioner and the OSHA Review Board that he wishes to contest the citation or proposed assessment of penalty. If, within 15 working days from the receipt of the notice issued by the commissioner, the employer fails to notify the OSHA Review Board that he intends to contest the citation, or proposed assessment of penalty, the citation and the assessment, as proposed, shall be considered final and not subject to review by any court.

20. AS 18.60.030(6) provides:
*Duties of Department of Labor.* The Department of Labor shall
(6) establish and enforce occupational safety and health standards that prescribe requirements for safe and healthful working conditions for all employment, including state and local government employment, and the requirements are to be at least as effective as those requirements promulgated by the United States Secretary of Labor under § 6 of Public Law 91–596 [29 U.S.C. §§ 651–78];

21. AS 18.60.670 provides:
*Prohibition against placement of equipment near electrical power lines and conductors.*

No person individually or through an agent or employee may
(1) place any type of tool, equipment, machinery or material which is capable of lateral, vertical or swinging motion, within 10 feet of a high voltage overhead electrical line or conductor;
(2) store, operate, erect, maintain, move or transport tools, machinery, equipment, supplies, materials, apparatus, buildings or other structures within 10 feet of a high voltage overhead electrical line or conductor.

22. AS 18.60.675 provides:
*Posting of warning sign before operation.*
No person individually or through an agent or employee may operate a crane, derrick, power shovel, drilling rig, hoisting equipment, or similar apparatus, any part of which is capable of vertical, lateral or swinging motion, unless the operator or his employer posts and maintains in plain view of the operator, a durable warning sign legible at 12 feet, which reads as follows: 'It is unlawful to operate this equipment within 10 feet of high voltage lines.'
AS 18.60.680 provides:
*Placement of barriers for temporary work.* Before a person is going to temporarily engage in work or other activity in closer proximity to a high voltage line or conductor than is permitted by § 670 of this chapter, he shall immediately notify the operator or owner of the high voltage line or conductor of the work to be performed and make appropriate arrangements, with payment satisfactory to the operator, for the installation of temporary mechanical barriers, temporary deenergization and grounding of the conductors, or a temporary raising of the conductors. Costs incurred by an operator or owner of a high voltage line or conductor in providing barriers, deenergization, and grounding as specified in this section shall be paid by the person engaging in the work which requires these protective measures.

We find that the State Department of Labor had a duty to use due care in attempting to abate the hazardous operation of the backhoe near high voltage lines; that this duty was owed to Poitras; and that the state has no immunity under AS 09.50.250. Therefore, the superior court's order granting summary judgment is REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.

ERWIN, J., did not participate.

CONNOR, Justice (dissenting).

For reasons stated in my dissent in *Adams v. State*, 555 P.2d 235, 244–48 (Alaska 1976), I would hold that the state was not under an actionable duty to enforce the safety regulations at issue here. I would, therefore, affirm the entry of summary judgment in favor of the state.