**Roy W. HAMMOND, Appellant,**

v.

**BECHTEL INCORPORATED and Alyeska Pipeline Service Co., Appellees.**

**No. 3859.**

Supreme Court of Alaska.

Feb. 22, 1980.

---

Frederic E. Brown, Fairbanks, for appellant.

Max N. Peabody, Shimek & Peabody, Anchorage, for appellees.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BOOCHEVER and BURKE, JJ., and DIMOND, Senior Justice.

RABINOWITZ, Chief Justice.

On July 12, 1974, Roy Hammond was injured when he stepped off a D–8 Caterpillar he had loaded onto a lowboy trailer and fell through a hole in the trailer. At the time of the accident, he was employed by General-Alaska-Stewart, a contractor engaged in the construction of the Happy Valley Camp on the Trans-Alaska Pipeline.

General-Alaska had a shop at Happy Valley for maintaining the equipment used in its construction activities. After the accident, Hammond had a conversation with a mechanic employed by General-Alaska at Happy Valley with regard to the condition of the lowboy trailer. Hammond's deposition in this case, filed in the superior court, states that the General-Alaska mechanic told him that General-Alaska had been informed of the hole in the trailer and had been told to make the necessary repairs on

several occasions. The deposition also states that the driver of the tractor used to pull the trailer told Hammond that "he had warned them five times to fix that [trailer] before someone got killed. . . ." Hammond further stated that he had been given a similar account as to the contractor's knowledge of the condition of the trailer by another mechanic who had been at the Happy Valley jobsite.

Bechtel was the Construction Management Contractor for the pipeline project. Bechtel's contract with the Alyeska Pipeline Service Company, a consortium of several oil companies formed to build and manage the Trans-Alaska Pipeline, provided that for the purposes of the project Bechtel was to

> [a]ct as ALYESKA's representative during construction to administer Execution Contracts; monitor EXECUTION CONTRACTORS' performance for quality, cost and schedule, ensuring appropriate and timely corrective actions where needed; and coordinate interfaces between these EXECUTION CONTRACTORS.

The contract further provided that Bechtel, in this representative capacity, was to have certain duties with respect to safety:

> A. CMC [Bechtel] shall observe and abide by and require its subcontractors and the EXECUTION CONTRACTORS to observe and abide by all ALYESKA safety rules and all safety regulations and LAW, including but not limited to: State of Alaska General Safety Code, U.S. Department of Labor Safety and Health Regulations for Construction, and the Williams-Steiger Occupational Safety and Health Act of 1970, including any revisions of the foregoing that may hereinafter be applicable.
>
> B. Said rules, laws, and regulations are designed as minimum requirements for CMC, and CMC shall take any additional precautions necessary or proper under the circumstances to prevent injury or death to persons and/or damages to property.

General-Alaska was an "execution contractor" in the terms of the pipeline contracts.[1] General-Alaska's contract with Alyeska provided that it "is, and shall be deemed to be, an independent contractor and not the agent or employee of OWNERS or ALYESKA. Neither ALYESKA nor OWNERS shall have any authority to supervise the employees or representatives of [General-Alaska] and accomplishing WORK shall be under the supervision and control of [General-Alaska]." The contract provided that General-Alaska was to "furnish all supervision, consultation, construction services, labor, certain construction tools and equipment and other services as required for the proper field engineering and civil construction work," and to "be responsible for safety related to and during the prosecution of WORK. . . ." The contract further defined General-Alaska's safety responsibilities in language similar to that used to define Bechtel's duties in that regard as Construction Management Contractor, as quoted above.

On December 23, 1974, approximately five months after his accident, Hammond filed a tort action against Bechtel and Alyeska. He alleged that Bechtel had a contractual obligation to Alyeska to insure that defective equipment was not utilized on the pipeline, and claimed that he was a third-party beneficiary of this contract. He additionally alleged that, pursuant to the Alyeska/Bechtel contract, Bechtel was "in control of the project" and had "an express and absolute duty to provide adequate and proper safeguards." Hammond asserted that Bechtel was acting as Alyeska's agent and that, therefore, Alyeska was responsible for any breach of duty committed by Bechtel in this regard.

Defendants Bechtel and Alyeska subsequently moved for summary judgment. Their motion argued that Hammond's employer General-Alaska was an independent

---

1. Actual construction of the pipeline and of support and maintenance facilities was left to various "execution contractors" under direct contract to Alyeska. General-Alaska, as one of these execution contractors, was to perform "civil construction work for Segment 6 North of the Yukon River to Prudhoe Bay Highway . . . ."

contractor on the pipeline. Therefore, the motion asserted, neither Alyeska nor Bechtel had a duty to inspect or repair General-Alaska's equipment, and neither was responsible for any negligence of General-Alaska with regard to equipment maintenance. With regard to Hammond's claim that he was a third-party beneficiary of the contract between Bechtel and Alyeska, the motion asserted that Hammond was only an incidental and not an intended beneficiary of the contract, and thus lacked standing to file a suit based on any safety responsibilities assumed by Bechtel under that contract.

In support of this motion, Alyeska and Bechtel relied on the terms of the contracts between Alyeska and General-Alaska, summarized above. They also submitted an affidavit by V. S. Nielsen, Bechtel's senior manager for the pipeline project, which stated in part:

4. Bechtel, as the Construction Management Contractor, did not have the authority to direct the method and manner of the work accomplished by the execution contractors.

5. Pursuant to Bechtel's contract with Alyeska, Bechtel was not required to perform, and did not perform, maintenance on equipment used by the execution contractors.[2]

Hammond's argument in opposition to the motion for summary judgment included a list of genuine issues of material fact. The majority of these alleged issues were framed in terms of his claim that Bechtel had assumed the duty to inspect the equipment used in pipeline-related construction by Alaska-General and other "execution contractors," and had the duty to ensure that General-Alaska not use dangerous or defective equipment, as well as the necessary control or power over General-Alaska's operations to perform that duty. Ham-

mond also argued that he had standing to sue Bechtel for breach of its safety responsibilities under its contract with Alyeska, since he was a member of the class of persons intended as beneficiaries of those provisions of the contract.

Hammond's arguments relied on his deposition and affidavit filed with the superior court. The affidavit stated in part:

2. During the time I was employed by General-Alaska-Stewart there were constantly on the job safety inspectors employed by Bechtel and wearing Bechtel identification tags and caps whose responsibilities included inspection of equipment utilized by General-Alaska on the job.

3. It was then and is now my understanding that Bechtel had assumed the responsibility of insuring that dangerous or defective equipment would not be utilized on the job and that the performance of this function was for my benefit and for the benefit of all employees utilizing such equipment.

4. I learned after the accident that a Bechtel safety inspector had 'red tagged' the equipment in question, thereby asserting his conclusion that the equipment was dangerously defective and not to be used until repaired.

5. To my recollection, Bechtel safety employees had the authority to, and did on several occasions, direct that defective equipment not be used. Bechtel employees had the authority to suspend or terminate the job in the event of non-compliance with the terms of its contract with Bechtel, one of which terms was that General-Alaska would observe and comply with all safety regulations and laws.

6. The lowboy was utilized by my employer in spite of having been 'red tagged.' It would not have been utilized had Bechtel safety inspectors fulfilled

---

2. The defendants' argument also relied on Hammond's deposition to establish that, while the trailer in question was owned by Alyeska and lent to Hammond's employer General-Alas-

ka, it was not defective when supplied to General-Alaska. Hammond did not contest this assertion.

1273

their responsibilities and seen that such defective equipment not be utilized prior to repair.

Hammond's deposition further described Bechtel's safety inspection practices.[3]

The superior court granted summary judgment in favor of Bechtel and Alyeska. The court's opinion ruled that Hammond was "only an incidental beneficiary and not an intended beneficiary" of any safety responsibilities assumed by Bechtel in its contract with Alyeska. The superior court's opinion continued:

It is uncontroverted from Plaintiff's own testimony that representatives of Bechtel did contact Plaintiff's employer and warned Plaintiff's employer of the hole in the lowboy and further warned Plaintiff's employer not to use the lowboy. Accordingly, Bechtel had complied with any obligations it gratuitously assumed concerning inspection of equipment.

Relying on our opinions in *Sloan v. Atlantic Richfield Co.*, 552 P.2d 157 (Alaska 1976),

and *Morris v. City of Soldotna*, 553 P.2d 474 (Alaska 1976), the superior court ruled that Bechtel was not responsible for any negligence of Hammond's employer General-Alaska in failing to repair the lowboy trailer, and was not otherwise vicariously liable as a general contractor for any such negligence.

We find that the superior court erred in granting summary judgment in this case. As a matter of general principle, "the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants."[4] This principle is applicable to Alyeska and Bechtel insofar as they maintained an "independent contractor" relationship with General-Alaska. Moreover, as the superior court correctly noted, we have declined to follow the example of some jurisdictions and impose vicarious liability in favor of the employees of an independent contractor on a general contractor for the negligence of the independent contractor.[5] However, even in refusing to adopt a rule of vicarious liability

---

**3.** In his deposition, Hammond stated that Bechtel safety inspectors had stopped him several times and "checked over" the Caterpillar that he was operating. He also stated that safety problems were referred to Bechtel inspectors on occasion.

**4.** Restatement (Second) of Torts § 409 (1965). *See Morris v. City of Soldotna*, 553 P.2d 474, 478 (Alaska 1976); *Sloan v. Atlantic Richfield Co.*, 541 P.2d 717, 725 (Alaska 1975); *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933, 934 (Alaska 1968); *Matanuska Elec. Ass'n, Inc. v. Johnson*, 386 P.2d 698, 699 (Alaska 1963). *See also* W. Prosser, Law of Torts § 71, at 468 (4th ed. 1971).

**5.** *Sloan v. Atlantic Richfield Co.*, 552 P.2d 157, 160–61 (Alaska 1976) (citations omitted):

In general, we adhere to the rule that the owner of premises or the general contractor thereon owes to the servants of its independent contractors the duty to avoid endangering the employee by his own negligence or affirmative act, but owes no duty to protect the employee from the negligence of the employee's own master. The purpose of the vicarious liability exception is to insure that the employer did not 'escape' liability in the sense that no financially responsible party is

left available to compensate the injured workman. Under Alaska's system of workmen's compensation, there is by definition a financially responsible party, thus the purpose of vicarious liability has already been served.

*See also State v. Morris*, 555 P.2d 1216, 1220–21 (Alaska 1976); *Morris v. City of Soldotna*, 553 P.2d 474, 481–82 (Alaska 1976) ("appellant's right to recovery cannot be based on any concept rooted in the doctrine of vicarious liability"); *Matanuska Elec. Ass'n, Inc. v. Johnson*, 386 P.2d 698, 702 (Alaska 1963).

While Hammond urges us to overrule *Sloan* and impose vicarious liability on Bechtel and Alyeska in this case, we decline to do so, particularly since we have concluded that the summary judgment granted against Hammond here must be reversed on the basis of present principles of Alaska tort law. In refusing to expand the concept of vicarious liability into this area, we are not unaware of the arguments and analysis of commentators in this regard. Indeed, one commentator has suggested that joint liability be imposed on the employer/general contractor and the independent contractor, with liability as between those parties apportioned by negotiated indemnification agreements. Note, *Risk Administration in the Marketplace: A Reappraisal of the Independent Contractor Rule*, 40 U.Chi.L.Rev. 661 (1973). *See Amoco*

in *Sloan v. Atlantic Richfield Co.*, 552 P.2d 157, 160–61 (Alaska 1976), we recognized that where an employer, owner, or general contractor "is independently responsible, as by a failure to prudently exercise controls retained over the details of performing the work at the jobsite, or by a failure to turn over premises free of unreasonable safety hazards, we will allow suit by the employee of the independent contractor." *Id.* at 160 (footnote omitted).[6]

One source of such independent responsibility is defined in section 414 of the Restatement (Second) of Torts (1965). In *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933, 934 (Alaska 1968), we expressly adopted the statement of common law liability in section 414:

> Negligence in Exercising Control Retained by Employer
>
> One who entrusts work to an independent contractor, but who retains the con-

trol of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.[7]

The nature of the control retained necessary to create exposure to liability is further delineated in the comments to section 414. Comment "a" makes it clear that the required control is not inconsistent with a generally independent contractor relationship and is, therefore, distinguishable from the degree of general control which characterizes a master-servant relationship:

> The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or oth-

---

**6.** *Prod. Co. v. W. C. Church Welding*, 580 P.2d 697, 698 (Alaska 1978) (per curiam); *Manson-Osberg Co. v. State*, 552 P.2d 654, 658–60 (Alaska 1976) (upholding express indemnity clauses in construction contracts as not contrary to public policy in absence of unscrupulousness or unequal bargaining power). *But see* AS 45.47.010 (declaring agreements "affecting any construction contract" which purport to "indemnify the promisee against liability for [certain] damages . . . [caused by] the sole negligence or wilful misconduct of the promisee or the promisee's agents, servants or independent contractors who are directly responsible to the promisee" to be "against public policy and . . . void and unenforceable"). Other commentators have also called for a considerable narrowing of the independent contractor rule. *See* Calabresi, *Some Thoughts on Risk Distribution and the Law of Tort*, 70 Yale L.J. 499, 545 (1961); Morris, *Torts of Independent Contractors*, 29 U.Ill.L. Rev. 339 (1934). *But see* Steffen, *Independent Contractor and the Good Life*, 2 U.Chi.L.Rev. 501 (1935) (pointing out difficulties in abolishing the general rule).

**6.** Dean Prosser observed that the number of exceptions to the "general rule" of non-liability based on concepts of independent responsibility "is sufficient to cast doubt upon the validity of the rule." W. Prosser, Law of Torts § 71, at 468 (4th ed. 1971) (footnote omitted). The most widely recognized "exceptions" are stated in sections 410 to 429 of the Restatement

(Second) of Torts (1965). *See also Pacific Fire Ins. Corp. v. Kenny Boiler and Mfg. Co.*, 201 Minn. 500, 277 N.W. 226, 228 (1937) ("Indeed it would be proper to say that the rule is now primarily important as a preamble to the catalog of its exceptions.")

**7.** This "exception" to the independent contractor rule simply defines a generic situation in which liability is imposed on the employer or general contractor for its own negligence, not that of the independent contractor. As Dean Prosser said:

> Various reasons have been advanced for . . . [the independent contractor rule], . but the one most commonly accepted is that, since the employer has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and administering and distributing it.

W. Prosser, Law of Torts § 71, at 468 (4th ed. 1971) (footnote omitted). The liability rule in section 414 addresses the situation where the employer or general contractor has a right of control and the above-stated rationale for the independent contractor rule has no validity. This has been a "generally recognized exception." *United States v. Cline*, 410 F.2d 1337, 1342 (9th Cir. 1969).

ers. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.[8]

The precise nature and extent of the necessary control is expressed in comment "c" in terms particularly appropriate to the present case:

In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a

right of supervision that the contractor is not entirely free to do the work in his own way.

■ The question whether Alyeska and Bechtel retained sufficient control in this case to warrant imposition of liability would generally be a question of fact for the jury, or for the trial judge in a judge-tried case.[9] The broad safety language in the Alyeska/Bechtel contract, as quoted above, is certainly not inconsistent with Bechtel's retention of such control. Moreover, while the language of the contract between General-Alaska and Alyeska might be seen as divesting Bechtel of such control or delegating its safety responsibilities to General-Alaska,[10] we think that Hammond presented a genuine issue of fact as to Bechtel's duties and control.[11] Such a genuine issue is raised by Hammond's affidavit and deposition describing Bechtel's extensive safety inspection practice and, most importantly, his assertion in an affidavit that "Bechtel safety employees had the authority to, and did on several occasions, direct that defective equipment not be used."

This factual assertion by Hammond distinguishes the present case from *Morris v.*

---

**8.** Perhaps the most important factor in determining whether a relationship is to be characterized as master-servant or independent contractor is the first such factor listed in Restatement (Second) of Agency § 220(2) (1958):

(a) the extent of control which, by the agreement, the master may exercise over the details of the work; . . . .

*See, e. g., Hollingbery v. Dunn*, 68 Wash.2d 75, 411 P.2d 431, 435 (1966). Therefore, it is this issue of control in a more general sense which courts examine to determine whether a master-servant relationship exists such as would warrant the imposition of vicarious liability on the employer. *See, e. g., Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 785–90 (3d Cir. 1978); *Franklin v. Puget Sound Tug & Barge Co.*, 21 Wash.App. 517, 586 P.2d 489, 492–96 (1978).

**9.** *See Morris v. City of Soldotna*, 553 P.2d 474, 478 (Alaska 1976); *Sloan v. Alantic Richfield Co.*, 541 P.2d 717, 724 n. 14 (Alaska 1975); *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933, 935 (Alaska 1968).

**10.** We have not been asked to consider whether Bechtel's safety responsibilities were non-

delegable. *See, e. g., Kirk v. Kemp Bros.*, 12 Cal.App.3d 136, 90 Cal.Rptr. 553, 555 (1970); *Allison v. Huber, Hunt & Nichols, Inc.*, 362 N.E.2d 193 (Ind.App. 1977); *Kelley v. Howard S. Wright Constr. Co.*, 90 Wash.2d 323, 582 P.2d 500, 504–07 (1978) (en banc). *See generally* W. Prosser, Law of Torts § 71, at 470–72 (4th ed. 1971).

**11.** Summary judgment is appropriate only where there is "no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." Alaska R.Civ.P. 56(c).

*See, e. g., Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.*, 584 P.2d 15, 24 (Alaska 1978); *Champion Oil Co., Inc. v. Herbert*, 578 P.2d 961, 963 (Alaska), *cert. denied*, 439 U.S. 980, 99 S.Ct. 565, 58 L.Ed.2d 650 (1978); *Jennings v. State*, 566 P.2d 1304, 1308–09 (Alaska 1977); *Brock v. Rogers & Babler, Inc.*, 536 P.2d 778, 782 (Alaska 1975); *Braund, Inc. v. White*, 486 P.2d 50, 54 n. 5 (Alaska 1971).

*City of Soldotna*, 553 P.2d 474 (Alaska 1976), in which we affirmed a directed verdict for the City, and on which Bechtel and Alyeska rely. In *Morris*, we found the record "devoid of any evidence that . . . [the City of Soldotna] actively controlled any aspect of Custom Painting's [the independent contractor and Morris' employer] work." *Id.* at 479. Additionally, in *Morris* we declined to find that affirmative safety duties had been imposed on the City by the relevant contracts, which we found only to contain "the standard boilerplate provisions with respect to safety." *Id.* at 480. Here, in contrast, the safety responsibility provisions of the Alyeska/Bechtel contract are more than mere boilerplate and, particularly in light of Bechtel's alleged safety activities and powers, leave ample room for the implication that Bechtel had affirmative contractual safety duties.[12]

Our decision in *Hobbs v. Mobil Oil Corp., supra*, where we reversed a summary judgment entered in favor of Mobil Oil, the employer of the independent contractor for whom Hobbs worked, provides support for our decision in this case. In *Hobbs*, we found that a genuine factual issue had been presented as to Mobil Oil's control over Hobbs' employer's operations, in light of the supervisory authority retained by Mobil Oil in the contract there and "the fact that on two separate occasions, according to . . . [Hobbs'] deposition, he was directed in his work by an employee of Mobil stationed on the drilling platform." 445 P.2d at 936. While the nature of the contractual duty alleged in this case is distinct from that which we found present in *Hobbs*, both cases contain allegations that control over the independent contractor's operations had in fact been exercised.

There are also numerous decisions in other jurisdictions which support our conclusion that summary judgment was improperly granted in this case. In *Smith v. United States*, 497 F.2d 500 (5th Cir. 1974), for instance, a prime contractor "specifically agreed to guarantee that subcontractors would comply with the safety requirements." *Id.* at 512. Though, in contrast to the facts alleged here, the prime contractor in *Smith* had not in fact exercised the "slightest control" as to the methods used by the subcontractor's employees, the federal court of appeals held that the prime contractor had the requisite authority to control the safety procedures employed at the jobsite, but failed to perform its affirmative contractual duties in that regard. *Id.* at 513–14.

Also persuasive is *Pasko v. Commonwealth Edison Co.*, 14 Ill.App.3d 481, 302 N.E.2d 642 (1973). In *Pasko*, the court found that the

[d]efendant could order the work halted if it felt that unsafe procedures were being followed, and could prevent the work from being resumed until, in its opinion, proper means and methods were employed to avoid injury or property damage. Defendant could order that any of . . . [the independent contractor's] equipment be removed from the jobsite, if, in its opinion, such equipment was unsafe or inadequate. . . . [I]t was, at the very minimum, a question of fact for the jury as to whether the defendant had retained sufficient control over the safety aspects of the project as to be liable for a failure to properly exercise that control.

---

**12.** *State v. Morris*, 555 P.2d 1216 (Alaska 1976), is similarly distinguishable from the present case. There we reversed a superior court verdict which found that the state had retained sufficient control over a bridge construction project to subject itself to liability for the death of an employee of the contractor, allegedly due to inadequate safety equipment and precautions. A majority of this court found that the state had not in fact exercised control over the project's safety standards and declined to impose a duty to exercise such control as a matter of law, since the contract imposed that responsibility on the contractor. *Id.* at 1218–20.

*Id.* 302 N.E.2d at 648–49.[13] Similarly, a question of fact is presented here as to Bechtel's alleged failure to properly exercise its retained control and order General-Alaska not to use the lowboy trailer in question until it was repaired.[14]

As noted above, the superior court apparently concluded that since Bechtel assumed its safety responsibilities "gratuitously," it fulfilled any duty so assumed by warning General-Alaska of the hazard and "red tagging" the lowboy trailer. Given the ambiguous terms of the relevant contracts as outlined above and the absence of a full development of the facts as to Bechtel's

safety activities and control in the context of a summary judgment motion, we are unable to conclude whether Bechtel can be said to have assumed any safety-related duties voluntarily or pursuant to its contract with Alyeska. However, whether voluntary or contractual,[15] a question of fact was presented as to the extent of the duty assumed by Bechtel. This question can only be answered by a finding of fact as to the nature of any right to control the manner and means of General-Alaska's performance for safety purposes.[16]

The question whether Bechtel was negligent or exercised reasonable care in this

---

**13.** The *Pasko* court defined the nature of the appropriate inquiry in terms which are useful here:

> Before an employer can be subjected to liability under this rule there must be such a retention of a right to supervise that the contractor is not entirely free to do the work in his own way. The power to forbid work from being done in a manner likely to be dangerous to himself or others is given as an illustration of the type of power retained by an employer which could subject him to liability. An employer may therefore be held accountable if he knows—or through the exercise of reasonable care should have known—that the work of the independent contractor is being carried out in a dangerous manner, and has an opportunity to prevent it by the exercise of the power of control which he has retained in himself but takes no action.

*Pasko v. Commonwealth Edison Co.*, 14 Ill. App.3d 481, 302 N.E.2d 642, 648 (1973).

**14.** Other cases which support our holding in this case include *Summers v. Crown Constr. Co.*, 453 F.2d 998 (4th Cir. 1972) (applying West Virginia law to uphold entry of judgment against general contractor whose job superintendent knew of defective crane and did nothing to have it repaired or replaced, though he had the authority "to ensure that an independent contractor corrected an unsafe situation or practice"), and *DiSalvatore v. United States*, 456 F.Supp. 1079 (E.D.Pa.1978) (denying summary judgment based on section 414 as adopted in Pennsylvania, since question of fact presented as to whether federal engineer had sufficient control to create duty to direct safety practices and whether he was negligent in performing that duty). *See also Weber v. Northern Illinois Gas Co.*, 10 Ill.App.3d 625, 295 N.E.2d 41, 50 (1973) (reversing summary judgment):

> We conclude that a factfinder could determine that . . . [the employer] met the

standards of control expressed in the comments [to section 414]. It did retain the power to forbid the work being done in a manner dangerous to others. *It did fail to* prevent the subcontractor from doing the details of the work in a dangerous manner when it knew it was so being done. It had more power than to make only suggestions or recommendations, and it did retain such a right of supervision that the subcontractor was not entirely free to do the work in his own way.

We also note the analytical similarity between the situation alleged by Hammond here and that presented in *Adams v. State*, 555 P.2d 235 (Alaska 1976), and *Wallace v. State*, 557 P.2d 1120 (Alaska 1976). In those cases we held that the state had voluntarily assumed a common law duty by its affirmative conduct in undertaking fire and safety inspection and enforcement activities. We found that a question of fact was therefore presented as to whether the state was negligent and liable in failing to exercise its authority to compel correction of known unsafe conditions.

**15.** "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully . . . ." The concept of voluntary assumption of a duty has long been recognized in Alaska . . . . .

*Adams v. State*, 555 P.2d 235, 240 (Alaska 1976), *quoting, Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 276 (1922). *See also Shannon v. City of Anchorage*, 429 P.2d 17, 18–19 (Alaska 1967); Restatement (Second) of Torts § 324A (1965).

**16.** *See Ossenfort v. Associated Milk Producers, Inc.*, 254 N.W.2d 672, 676–77 (Minn.1977):

> It is for the trier of fact to distinguish between the "right-to-control" characteristic of an employer-employee relationship and the fact of powerful influence not inconsistent with an independent-contractor relationship.

case is dependent on the degree of control in fact retained by Bechtel and other relevant facts and circumstances, and is similarly a question of fact for the factfinder on the record presented here.[17] Accordingly, while we do not purport to determine Bechtel's duty, negligence, or liability for any injuries allegedly suffered by Hammond, we find that the superior court's entry of summary judgment must be Reversed, and this case Remanded for trial.[18]

MATTHEWS, J., not participating.

The label which the contract attaches to the employment relationship is not solely determinative. We look, rather, primarily to the conduct of the parties operating under the contract.
*See also* note 9 *supra* and accompanying text.

17. *See, e. g., Byrd v. Merwin*, 456 Pa. 516, 317 A.2d 280, 282 (1974) (section 414 designed to impose liability relative to the "degree of control as to supervision" retained). *See also State v. Guinn*, 555 P.2d 530, 534–35 (Alaska 1976); *Kremer v. Carr's Food Center, Inc.*, 462 P.2d 747 (Alaska 1969).

We are mindful of the fact that some jurisdictions have been reluctant to impose liability on an employer or general contractor who exercises only general supervisory safety duties, while leaving primary safety responsibilities to the subcontractor. Cases so holding reason that a broad liability rule allows injured workmen to circumvent too easily the worker's compensation law's purpose of reducing litigation arising out of the employment relationship, and might serve to discourage any safety involvement by employers or general contractors, thereby possibly reducing the overall level of worker safety. *See Chesin Constr. Co. v. Epstein*, 8 Ariz. App. 312, 446 P.2d 11 (1968); *Fresquez v.*

*Southwestern Industrial Contractors and Riggers, Inc.*, 89 N.M. 525, 554 P.2d 986 (App. 1976); *Wienke v. Ochoco Lumber Co.*, 276 Or. 1159, 558 P.2d 319 (1976); *Wilson v. Portland Gen. Elec. Co.*, 252 Or. 385, 448 P.2d 562 (1968) (en banc). *See also Adams v. State*, 555 P.2d 235, 244–48 (Alaska 1976) (Connor, J., dissenting). However, since the nature of the control exercised by Bechtel has not yet been factually developed, we cannot decide whether any such control was sufficient to subject Bechtel to liability in this case as a matter of law.

18. Because the record does not allow a conclusion as to whether any duty assumed by Bechtel was voluntary or contractual, we find it unnecessary to address Hammond's theory that he was a third-party beneficiary of Bechtel's contractual safety responsibilities. It is sufficient to note that Bechtel's liability, whether termed contractual or tort, is dependent on its retained right of control. *Cf. Wallace v. State*, 557 P.2d 1120, 1123–24 (Alaska 1976); *Adams v. State*, 555 P.2d 235, 241–43 (Alaska 1976) (discussing persons to whom common law duty assumed by undertaking fire and safety inspection activities is owed).