**STATE of Indiana, DEPARTMENT OF NATURAL RESOURCES, Defendant-Appellant,**

**v.**

**Elsie Evelyn MORGAN, as Personal Representative of the Estate of James Morgan, deceased, David Morgan, and Union Bank and Trust, Guardian of Joyce Lynn Morgan, Plaintiffs-Appellees,**

**v.**

**BOARD OF COMMISSIONERS OF CLAY COUNTY, Defendants.**

**No. 1–581A161.**

Court of Appeals of Indiana,
First District.

March 10, 1982.

Rehearing Denied April 21, 1982.

Linley E. Pearson, Atty. Gen., Terry G. Duga, Deputy Atty. Gen., Indianapolis, for defendant-appellant.

Vernon J. Petri, John J. Fuhs, Petri, Fuhs & Doehrman, Spencer, for plaintiffs-appellees.

RATLIFF, Presiding Judge.

## STATEMENT OF THE CASE

State of Indiana, Department of Natural Resources (Department), appeals from a judgment rendered against it on appellees' claims of negligence. We reverse.

## STATEMENT OF THE FACTS

In 1964, 1965, and 1966, Central Coal and Clay Company, Inc., received permits from Department pursuant to the 1941 Indiana Strip Mining Law (Strip Mining Law) to do surface or strip mining on a tract of land located in Clay County, Indiana. The strip pit located on the land was named the Fineran-Wilson pit. After the completion of the strip mining, the land was revegetated as required by the Strip Mining Law. The Fineran-Wilson pit was filled in with water. In 1971, Department found the Central Coal and Clay Company, Inc., had complied with the statute and released the company's bond.

On August 10, 1976, James Edward Morgan (James) along with two of his children, David, age fourteen years, and Joyce, age five years, went to inquire about purchasing a pony for Joyce. They left their home in a pickup truck which was pulling an empty horse trailer. As James drove down Center Point Road in Clay County, Indiana, the truck hit something in the road. When David looked back, he noticed the horse trailer had become detached from the hitch and was hitting the truck. James attempted to keep the truck under control; how-

ever, he was unsuccessful. The truck went off the road to the right, then across the road and off it to the left, and then across the road into the Fineran-Wilson pit. The pickup truck landed in the water approximately fifteen to twenty feet from shore. James, David, and Joyce were able to get out of the truck through the windows, and they stood in the bed of the pickup truck. A man who lived in the vicinity swam out to the truck, picked up Joyce, and swam back to shore with her. David and James jumped into the water and swam towards the shore. David made it to the shore; however, James, who could not swim, drowned. As a result of the accident, David suffered a bump on his head and Joyce received scratches on her knee.

Elsie Evelyn Morgan (Elsie) as surviving spouse and personal representative of James, Joseph Morgan, James Morgan, Jr., David, and Joyce filed suit for damages against the Clay County Board of Commissioners, Indiana State Highway Commission, Department, and Central Coal and Clay Company, Inc. Elsie's claim as surviving spouse and Joseph's and James Jr.'s individual claims were dismissed, along with the claim against the Indiana State Highway Commission. Subsequently, Elsie in her representative capacity, David, and Joyce filed first and then second amended complaints against Clay County Board of Commissioners, Department, Central Coal and Clay Company, Inc., and John Riddell. Before trial, the actions against Central Coal and Clay Company, Inc., and John Riddell were dismissed. Trial was had on appellees' claim against Department which alleged Department had been negligent in granting a permit to Central Coal and Clay Company, Inc., which allowed it to place the strip pit adjacent to the county road and in allowing the Fineran-Wilson pit to become a hazard and remain a hazard. The jury returned a verdict of three hundred thousand dollars ($300,000) against the Department and in favor of Elsie in her representative capacity, a verdict of fifty thousand dollars ($50,000) against the Department and in favor of Union Bank and Trust,

Guardian of Joyce, and a verdict of thirty thousand dollars ($30,000) against the Department and in favor of David. The jury's verdicts also found in favor of Clay County Board of Commissioners on all claims.

The trial court entered judgment on all the verdicts. After the trial court overruled its motion to correct errors, Department perfected this appeal.

## ISSUES

Department raises the following issues for our review:

1. Whether the trial court's judgment is erroneous as a matter of law since Department owed no duty to James, David, and Joyce.

2. Whether the trial court erroneously entered judgment against Department since Department is immune from liability in this suit.

3. Whether the trial court abused its discretion by allowing plaintiff's witness Walter Gray, Jr. to testify that the location of the Fineran-Wilson pit caused James' death.

4–7. Whether the trial court erred by giving certain instructions.

## DISCUSSION AND DECISION

*Issues One and Two*

Because of our decision to reverse, we will discuss only these first two issues.

Department argues that it owed no duty to appellees in this case. The bases for Department's argument are that the statute involved was not a safety law and furthermore, any duty arising under the statute, Act of February 28, 1941, Acts 1941, ch. 68, § 1, p. 172 as amended by Acts 1951, ch. 129, § 4, p. 331 and Acts 1963, ch. 106, § 3, p. 84[1] (codified in former Ind.Code Ann. §§ 46–1501 to 1513 (Burns Code Ed., Repl. 1965)) (hereinafter referred to as Strip Mining Law), was a duty owed to the land and general public, not a duty owed to appellees.

It is axiomatic that in order for a plaintiff to recover on a negligence claim, there must be a duty owed to the plaintiff, a breach of duty by the defendant, and damages. *Miller v. Griesel*, (1974) 261 Ind. 604, 308 N.E.2d 701. Whether a duty exists is a question of law. *Sports, Inc. v. Gilbert*, (1982) Ind.App., 431 N.E.2d 534. Duties which may be the bases of negligence actions may arise by operation of the common law or by statute. *Snyder v. Mouser*, (1971) 149 Ind.App. 334, 272 N.E.2d 627, *trans. denied*. Furthermore, the violation of a statute enacted for reasons of safety is negligence per se. *Northern Indiana Transit, Inc. v. Burk*, (1950) 228 Ind. 162, 89 N.E.2d 905.

Appellees contend the Department owed James a duty established by the Strip Mining Act. Precisely what duty was owed by Department, appellees do not state. Throughout their brief they allege various duties which the Department failed to meet: (1) to require the strip mine pit to be a certain number of feet from a public highway; (2) to erect guardrails between the strip mine pit and the public highway; (3) to maintain the pit; (4) to see that grading of the area near the strip pit was done; and (5) to make a proper inspection of the strip pit.

An examination of these contentions has led us to conclude that the main contention of appellees is the Department had a duty to require ôↄ to take safety measures, whether they be guardrails or placement of the strip pit farther from the roadway, to insure that a vehicle which left the road would not fall into the pit. Our conclusion is bolstered by the testimony of appellees' expert witness that he considered the strip pit to be a roadside hazard since it was contained within the minimum distance of thirty feet considered by traffic safety experts to be necessary for recovery if a vehicle were to leave the road for any reason. Thus, we will examine the Strip Mining Law to determine whether Department had a duty to James, David, and Joyce to pre-

---

1. This statute is now codified in Ind.Code 14– 4–2–1 to 14–4–2–14.

vent the location of the strip pit in close proximity to the roadway or to require some type of barrier between the roadway and strip pit.

Appellees argue the Department's duty arises from the language contained in the Strip Mining Law that "this act shall be deemed an exercise of the police powers of the state." Ind.Code Ann. § 46–1501 (Burns Code Ed., Repl. 1965). Specifically, they contend this language should not be limited to a few purposes specifically enumerated in the statute, but must be extended "to provide the protection of other interests of the citizens, as and whenever they arise." Brief for Appellees at 18. Thus appellees conclude:

> "Even though the strip mine law specifically lists the protection of property, the economic welfare, and the health of the people of the state as the purposes for which the statute was enacted (R. 1179, pg. 1 of Exhibit 26), it is not a strained or unreasonable interpretation of this statute to conclude that, when necessary, this statute will also provide for the safety of the citizens of this state."

Brief for Appellees at 19.

Clearly, appellees invite us to expand the language of the statute to include any duty which they believe should be found under the statute. We respectfully decline the invitation. Further, the language contained in the Strip Mining Law that the act is an exercise of the police powers of the state means the legislature had used the power inherent in government to enact laws to promote the order, safety, health, morals, and general welfare of society. *See Bruck v. State ex rel. Money*, (1950) 228 Ind. 189, 91 N.E.2d 349. Precisely what the legislature was promoting when it enacted the Strip Mining Law was specifically stated in the statute, and we will not expand the purpose of the statute by engrafting upon it the purpose of the safety of Indiana citizens.

Turning now to an examination of the Strip Mining Law, we find the purpose of the law was set out in Ind.Code Ann. § 46–1501 (Burns Code Ed., Repl. 1965), which stated:

"This act [§§ 46–1501—46–1513] shall be deemed an exercise of the police powers of the state, for the protection of the property, the economic welfare and the health of the people of the state by providing for the conservation and improvement of areas of land subjected to 'strip mining'; to aid thereby in the protection of game, bird, and wild life; to enhance the value of such land for taxation, to decrease soil erosion, the hazard of floods, the pollution of lakes and streams and generally to restore the use and enjoyment of such lands. All the provisions of this act shall be construed liberally for the accomplishment of its purposes."

Consistent with the purpose of the act, the other provisions provided for reclamation or revegetation of strip pits. The act provided that it was unlawful for anyone to operate a commercial strip mining operation without obtaining a permit from Department. Ind.Code Ann. § 46–1503 (Burns Code Ed., Repl. 1965). Once a strip mining operator received a permit, he or she could continue his or her strip mining operation if he or she met certain requirements. Ind.Code Ann. § 46–1505 (Burns Code Ed., Repl. 1965) provided:

"Every operator to whom is issued a permit, pursuant to the provisions of this act [§§ 46–1501—46–1513], may engage in commercial strip mining upon the strict performance of and subject to the following requirements:

(a) Said operator shall submit to the director in duplicate on or before September 1 annually, a map in form approved by the director setting forth the location by township, section and range, with such other description as will identify the land from which the operators removed any mineral by the strip mining method during the preceding permit year, with a legend upon such map showing the number of acres affected to the extent that the topography has been disturbed by such mining operations; and said operator shall submit to the director in duplicate on or before September 1 annually a

map in a form approved by the director setting forth the location by township, section and range with such other description as will identify that land stripped prior to the effective date of this act [February 28, 1941], which land the operator is required to plant in the amount and at such time as in this act provided. Any operator who fails to submit the required maps to the director before September 1 as provided in this section, shall be subject to a penalty of ten dollars [$10.00] per day for each day in which the maps are in arrears. The accuracy of the acreage shown upon the map may be checked by the director, and if found to be erroneous, it shall be corrected by the operator and a new map furnished as required by the director. Every operator to whom a permit is issued pursuant to the provisions of this act may engage in open cut mining upon the lands described in the permit upon the performance of and subject to the following requirements with respect to such lands.

(b) Grading shall be carried on to reduce peaks and ridges to a rolling topography where adjacent to public highways. On such areas to be afforested the operator shall work any ridges by striking off the same to a width of at least 10 feet at the top and any peaks shall be graded at the top to a minimum of 15 feet.

(c) The operator shall construct earth dams in final cuts of all operations where lakes may be formed, if necessary to impound water, provided the formation of said lakes will not interfere with underground or other mining operations or damage adjoining property.

(d) Where acid forming materials present in the exposed face of a mineral seam which has been mined are not covered by impounded water, the operator shall cover the same to a depth of not less than 2 feet with earth or spoil material.

(e) On all affected land which is to be afforested the operator shall construct fire lanes or access roads through said area, and said fire lanes or access roads shall be not less than 10 feet in width and shall be constructed so as not to be more than 440 yards apart.

(f) On all affected land which is to be seeded to pasture the operator shall strike off all peaks or ridges to a width of at least 15 feet at the top.

(g) On all affected land which is to be used for crops including hay or orchards, the operator shall strike off peaks and ridges and all valleys in such manner that the area can be traversed with farm machinery reasonably necessary for such use.

(h) Said operator shall sow, set out or plant upon such land affected by the mining operation described in said map, first described in section 5(a) [subsec. (a) of this section] or upon an equal number of acres of land previously mined by the operator and approved by the director, seed, plants, or cutting [cuttings] of trees, shrubs, or grasses as shall be recommended or approved in writing by the director. All of the applicable re-vegetation provisions of this act concerning lands to be stripped under a permit may apply to lands that have been stripped and were unplanted prior to the effective date of this act. In making such recommendations as to the planting, the director shall use the advice of foresters attached to the department of conservation [department of natural resources], to the end that the land may be in part covered by forests, and in part provide shelter and ground cover for wild life, seeded to pasture or devoted to orchards or other crops. The operator may elect the method by which an area is to be re-vegetated. In making his recommendations to the operator for areas to be re-forested the director shall indicate the approximate number of trees to be planted per acre basing his requirements on the standard practices used in forestry for the production of commercial forests. He shall not include the use of trees which are not ordinarily used in commercial forest practice nor shall the trees be required to be greater in size or age than are planted in similar commercial forest

projects. In making his recommendations to the operator for areas to be seeded for pasture or devoted to orchards or other crops the director shall base his recommendations on standard practice developed by Purdue University.

(i) All planting required by the director shall be done in the following planting season, and shall be prosecuted by the operator to completion with all reasonable diligence, except that no planting of any kind shall be required to be made on any affected land used by the operator for the deposit or disposal of refuse.

(j) The permit aforesaid, when issued, shall remain in effect until revoked by the department because of failure of the operator to perform any of the operator's legal requirements, or because of violation by the operator of any of the provisions of the act, or because of failure of the operator to pay the proper annual renewal fee within thirty [30] days after notice and demand therefor by the director."

Furthermore, the bond which an operator filed with Department as a condition precedent to the issuance of a permit was conditioned on the operator's faithful performance of all requirements of Department in accordance with provisions of the act. Ind. Code Ann. § 46–1507 (Burns Code Ed., Repl. 1965). Also, the Department had the power to refuse, modify, revoke, or cancel permits for due cause and in accordance with the provisions of the act. Ind.Code Ann. § 46–1509 (Burns Code Ed., Repl. 1965).

■ Contrary to appellees' assertion, we find nothing in this statute which requires the Department to take safety measures concerning the location of strip pits to a public roadway. The provisions of the statute were concerned with the planning and execution of revegetation and reclamation of land which is used for strip mining. Reclamation of the land for various uses was accomplished by grading, seeding grasses, planting trees or shrubs, constructing access roads, and filling strip pits in with dirt or water. The responsibility of Department in administering this law was to recommend or approve a planting plan. If the strip mining operation did not plant the required acreage, then Department could have procured the work to be performed by using the cash deposit or surety bond filed by the operator when he or she received a permit. However, Department had no authority nor was it required to take safety measures at a strip mining area. Thus, the Department owed no statutory duty to appellees to take safety measures around the Fineran-Wilson pit.

Neither do we believe the case at bar comes within the line of cases dealing with liability or nonliability of a governmental entity for failure to enforce safety statutes or regulations. *See Wallace v. State*, (1976) Alaska, 557 P.2d 1120 (State Department of Labor had duty to use due care in abating safety violation which it had discovered at a construction site.); *Adams v. State*, (1976) Alaska, 555 P.2d 235 (State Fire Marshal has common law duty to proceed to abate fire hazards revealed in its inspection of a hotel.); *Grogan v. Commonwealth*, (1979) Ky., 577 S.W.2d 4 (City of Southgate and State not liable for failure to enforce laws and regulations establishing safety standards for construction and use of buildings.); *Shelton v. Industrial Commission*, (1976) 51 Ohio App.2d 125, 367 N.E.2d 51 (State agency not liable for alleged negligent inspection and enforcement of safety standards.). In the above cited cases, the statutes involved were clearly ones which dealt with the enforcement of safety measures. Examples of such statutes are the Alaska statutes involved in *Adams v. State, supra.* Alaska Stat. § 18.70 states: "The Department of Public Safety shall foster, promote, regulate, and develop ways and means of protecting life and property against fire, explosion, and panic." In furtherance of this purpose, the Department of Public Safety was given the power to abate fire hazards which violated the law or regulations, Alaska Stat. § 18.70.070, to adopt rules and regulations for the purpose of protecting life and property from fire and explosions by establishing minimum standards for certain enumerated things, Alaska

Stat. § 18.70.080, and to enforce the regulations which it adopted. Alaska Stat. § 18.-70.090.

It is clear the Alaska statutes deal with the enforcement of certain safety measures required by law and administrative regulations. In contrast, however, the Strip Mining Law was not a safety regulation law. Its purpose, focus, and provisions dealt with the reclamation of stripped land. Neither the statute itself nor the regulations promulgated by Department require a strip pit to be a certain distance from a public roadway or any safety measures between a pit and a highway. Obviously, the concern of our legislature was that strip mining operations not leave the land a blighted, useless area, but instead that the stripped land be restored for use and enjoyment by the people of this state.

Finally, appellees contend Department owed James, David, and Joyce a general duty of care at common law and cite to us *Elliott v. State*, (1976) 168 Ind.App. 210, 342 N.E.2d 674, *trans. den.*; *Indiana State Highway Commission v. Rickert*, (1980) Ind. App., 412 N.E.2d 269, *trans. granted*, 425 N.E.2d 620 (Ind.1981); and *Indiana State Highway Commission v. Clark*, (1978) Ind. App., 371 N.E.2d 1323. In *Elliott, Rickert*, and *Clark*, this court found the state to have a duty at common law to exercise reasonable care in the design, construction, and maintenance of its highways for the safety of public users. Thus, appellees contend the same duty should be applied in the present case since "[w]hat is at issue is the negligent state of disrepair, along with the negligently maintained, water-filled strip

pit." Brief for Appellees at 21. We disagree.

Elliott v. State, supra; Indiana State Highway Commission v. Rickert, supra; and *Indiana State Highway Commission v. Clark, supra*, involved very different factual situations from the case at bar. In each of those cases in which the state was held liable for its negligence, the state had direct control of the instrumentality which caused the harm. It designed, constructed, and maintained the highways upon which the injuries were suffered. However, in the present case Department did not dig the strip pit or maintain it. Those actions were done by either the coal company or landowner. Department's function was to oversee the reclamation of the land. It had no control over the stripped land other than to require planting of vegetation. Since Department did not have control over the stripped land to require safety measures, we find it had no general duty at common law to James, David, or Joyce to require such measures be taken.[2]

Although we have found no duty on the part of Department to appellees, we will discuss briefly the issue of tort immunity. Department contends the trial court's judgment is erroneous because it (Department) is immune from liability in this case under the Indiana Tort Claims Act, Ind. Code 34–4–16.5–1 to 34–4–16.5–18. Appellees argue the tort immunity provisions are not applicable because of the following reasons: (1) the functions were ministerial ones;[3] (2) the act for which Department is liable is its negligent compliance with its

---

**2.** We note also that the common law doctrine of premises liability, *see Bell v. Horton*, (1980) Ind.App., 411 N.E.2d 648; *Barbre v. Indianapolis Water Co.*, (1980) Ind.App., 400 N.E.2d 1142, *trans. denied; Swanson v. Shroat*, (1976) 169 Ind.App. 80, 345 N.E.2d 872, or common law duty of care of a possessor of land who creates or permits to remain thereon an excavation or other artificial condition so near an existing highway that he or she realizes or should realize it involves an unreasonable risk to others who come into contact with it when foreseeably deviating from the highway in the ordinary course of travel, *see* Restatement

(Second) of Torts § 368 (1965); *Louisville & N. R. Co. v. Anderson*, (5th Cir. 1930) 39 F.2d 403; *Durst v. Wareham*, (1931) 132 Kan. 785, 297 P. 675, is not applicable in this case since Department neither owns nor occupies the land upon which the Fineran-Wilson pit is located.

**3.** Assuming the acts were ministerial, this does not preclude immunity under one of the sections of the Tort Claims Act. *See Seymour National Bank v. State*, (1981) Ind., 422 N.E.2d 1223, in which the State was held immune under Ind.Code 34–4–16.5–3(7) despite the fact the police officer's actions were ministerial.

own rules and regulations; [4] (3) even if the negligent acts of which appellees complain are inspection or enforcement, Department should not escape liability; (4) logic demands the Department be liable.

■ Assuming *arguendo* the Department had a duty under the Strip Mining Law not to issue permits for strip mining or allow strip mining operations to continue unless safety measures were taken by the strip mining operator, the failure of the Department to take appropriate action would fall within the umbrella of governmental immunity found in the Tort Claims Act. Ind.Code 34–4–16.5–3 provides in part:

> "A governmental entity or an employee acting within the scope of his employment is not liable if a loss results from:
>
> \* \* \* \* \* \*
>
> (7) the adoption and enforcement of or failure to adopt or enforce a law, including rules and regulations, unless the act of enforcement constitutes false arrest or false imprisonment; ..."

■ Furthermore, if Department's liability were predicated upon its failure to make an inspection of the Fineran-Wilson pit or making an inadequate inspection, the Department would be immune under Ind. Code 34–4–16.5–3(11) which grants governmental immunity for "failure to make an inspection, or making an inadequate or negligent inspection, of any property, other than the property of a governmental entity, to determine whether the property complied with or violates any law or contains a hazard to health or safety."

Having found the Department owed no duty to James, David, or Joyce, the judgment of the trial court is reversed.

Judgment reversed.

ROBERTSON, J., concurs.

YOUNG, J. (by designation), concurs.

4. Appellees' argument with regard to the regulations of Department have consistently focused upon the regulation which required grading to reduce peaks and ridges to a rolling topography where adjacent to public highways.

Inasmuch as no evidence was introduced to show any peaks or ridges were in question, we fail to perceive how this regulation is pertinent to the present case.