**PARKER DRILLING COMPANY, Appellant, Cross-Appellee,**

v.

**Melneeta O'NEILL, as Special Administratrix of the Estate of Thomas James O'Neill, Deceased, Appellee, Cross-Appellant.**

**Nos. 6999, 7436.**

Supreme Court of Alaska.

Nov. 25, 1983.

---

Sanford M. Gibbs, Hagans, Brown & Gibbs, Anchorage, for appellant and cross-appellee.

Bernard P. Kelly, Kelly & Luce, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, MATTHEWS and COMPTON, JJ., and BLAIR and CARLSON, Judges.*

## OPINION

RABINOWITZ, Justice.

Thomas James O'Neill was fatally injured on February 9, 1979, while working for Weatherford Oil Tool Co. The fatal accident occurred on Parker Drilling Company's Rig 141 operating in Prudhoe Bay. Weatherford and Parker were both independent contractors working for ARCO. Melneeta O'Neill sued Parker for injuries to herself and her two children as a result of her husband's death. The central issues in this appeal arise from the fact that Parker was not Thomas O'Neill's employer.

On February 9, O'Neill was working as a "stabber" on a platform called a stabbing board.[1] A stabbing board is a movable platform on a drill rig used to adjust the height of the stabber. It was described at trial as an open elevator.[2] The stabber's job was to reach out and grab each length of casing as it was lifted toward the rig, and align it so that his partner below, the "tong operator," could attach it to another length of casing, already extending down into the well. The tong operator would then run the casing down into the well and the process would be repeated with a new length of pipe.

It is undisputed that Parker supplied the drilling rig and had designed and built the stabbing board upon which O'Neill rode.[3] At the time of the accident O'Neill was working approximately forty-eight feet above the drill rig floor preparing to handle a section of casing that was being lifted by a traveling block on the side of the rig. The motion and speed of the traveling block, which weighed several tons, was controlled by a Parker employee called a "driller."[4] While O'Neill was waiting for the pipe to come into position, the ascending traveling block swayed and struck the bottom of the platform on which he was standing, raising the platform approximately four and one-half feet to the end of the tracks on which it moved. At that point the stabbing board came free of the block and fell back to its original position some four and one-half feet below. This fall caused the supporting cable for the board to break and the entire platform fell an additional twenty-one feet.

After the accident it was established that O'Neill had been using the stabbing board with its safety handle "tied off." The handle controlled a brake designed to prevent the platform from moving down unless the stabber manually held the handle in a neutral position. At the time of the accident

---

* Blair and Carlson, Superior Court Judges, sitting by assignment made pursuant to Article IV, Section 16, of the Constitution of Alaska.

1. O'Neill was part of a two-man casing crew sent to Rig 141 by Weatherford. O'Neill's job was called "pipe stabber" or just "stabber." O'Neill's partner, Leo Resecker, was called an "operator" or "tong operator."

2. An expert witness at trial explained that "stabbing board" is a vernacular term for a "movable, vertical work platform that is affixed to the drilling rig that is used in casing operations."

3. The Parker employee who designed and built the stabbing board was not an engineer, but was a rig welder. His sole preparation for constructing the board at Rig 141 was to make sketches of a stabbing board in use on another rig. He made no reference to engineering or elevator design standards in building the board.

4. The driller was also the immediate supervisor of the drill rig operation. He was the first person to whom the Weatherford casing crew reported, and he had responsibility for the safety of everyone on the drilling site, whether Parker employees or not. The chain of command next proceeded upward to the "toolpusher," who was also a Parker employee. The toolpusher also had safety responsibility for everything on the site. There was undisputed testimony that if either of the two Weatherford employees had perceived a hazardous working condition their proper recourse would have been to go first to the driller, second to the toolpusher, and third to the ARCO "company man." In addition to the driller and toolpusher, Parker also had a "drilling superintendent" for Prudhoe Bay, superior to both, and a safety engineer responsible for safety programs and safety inspections of the drill site.

the handle was tied with twine so that the brake remained disengaged. Although it was not established who tied off the handle, there was testimony at trial that every workman who used the stabbing board did so with the safety handle tied off. Employees from Rig 141 testified that the purpose of the brake was obvious to a workman with stabbing experience. It was agreed among witnesses who had worked with the board, however, that the placement and operation of the handle were awkward and inconvenient, and that the stabber's work was slowed considerably when the handle was engaged.[5]

O'Neill's widow sued Parker Drilling alleging numerous separate acts of negligence. More specifically, it was claimed that the stabbing board provided by Parker was unsafe in several respects,[6] that the operation of the drilling rig controls by Parker employees had been negligent,[7] and that Parker had been negligent in failing to establish reasonable safety procedures and controls to detect hazards such as those that existed at Rig 141.[8] These defects were allegedly the proximate cause of Thomas O'Neill's death.

The jury found that Parker was negligent and that Parker's negligence proximately caused Thomas O'Neill's death. The jury also determined that Thomas O'Neill was negligent and that this negligence was an additional proximate cause of the accident. The jury assigned 70% of the responsibility for the accident to Parker's negligence and 30% to O'Neill's. Total damages were calculated by the jury at $1,600,000, and the superior court thus awarded Melneeta O'Neill and her two children $1,120,-000 plus costs and attorney's fees. This appeal followed.

I. Parker's duty to supply a safe workplace.

The superior court granted O'Neill's widow a directed verdict on the issue of Parker's duty to supply Thomas O'Neill with a safe place to work. The court ruled that as a matter of law Parker had assumed such a duty. In its instructions to the jury, the court included statutory and regulatory provisions as more precise descriptions of

**5.** One workman named Sheldon Kirby had tried to use the board with the safety handle engaged some months before the accident, but found it "just about impossible to work" that way. He said that "you'd need three hands" to move the board while stabbing pipe. After one experience Kirby never again used the board without the handle tied off. Another worker explained that the reason he kept the handle tied back was that "I take pride in my work and I didn't want anybody waiting on me." Parker's representative at trial, although he had never ridden the stabbing board at Rig 141, offered his opinion that the stabber could estimate in advance how high the board needed to be for each new length of pipe, and could bypass the need for three-armed operation by positioning the board properly before the pipe was lifted up to him.

**6.** In her complaint Melneeta O'Neill alleged more than twenty negligent acts or omissions on the part of Parker. The charges with respect to Parker's negligent design and construction of the stabbing board, as modified for purposes of defending against Parker's appeal, include the following:
(1) Failure to provide a free-fall safety device on the stabbing board which could not be overridden manually.

(2) Use of a support cable that was not strong enough to support the board.
(3) Use of a traveling block with a protruding lip capable of hitting the stabbing board.
(4) Failure to provide a deflector plate to keep the traveling block from striking the stabbing board.

**7.** There was testimony that Parker's driller had been operating the rig at too great a speed, that he should have been watching for possible collisions between the traveling block and the stabbing board, and that the particular driller on Rig 141 at the time of O'Neill's accident was visually impaired so that he had no depth perception.

**8.** Although Parker admits that it was under an obligation to provide a safe stabbing board, and that it is responsible for the negligent acts of its driller, it vigorously contests any duty on its part to ensure the safety of the worksite for any other than its own employees. Melneeta O'Neill alleged below that Parker was obliged to adopt safety procedures which would have detected and rectified the particular hazards which killed Thomas O'Neill, and the failure to have such safety programs was a discrete item of negligence on Parker's part.

the duty assumed by Parker.[9] The consequence of the superior court's ruling was that Parker was potentially liable for any negligent failure on its part to implement adequate safety programs and procedures for the protection of an employee such as O'Neill. Parker argues that the superior court's analysis of the law was incorrect, and that the court misapplied the law to the facts.

### A. The source of the duty.

During trial the superior court concluded that Parker might be held liable for its failure to provide O'Neill with a safe place to work just as though Parker had been O'Neill's employer. The existence of such a duty running to Parker depended on the existence of certain facts. The factual question identified by the superior court was this: Did Parker exercise sufficient control over the work performed by O'Neill that it voluntarily assumed the duty to provide O'Neill with a safe place to work? The initial question here is whether the superior court's analysis was correct.

The superior court determined that two sections of the Restatement (Second) of Torts (1965) combined to create a common law duty running to one subcontractor to ensure the safety of the workplace for the employees of another subcontractor.[10] Un-

---

9. The two instructions given by the superior court regarding Parker's duty to supply a safe work place were as follows:

INSTRUCTION NO. 25

The Court has determined that the defendant has, through its conduct, assumed a duty to provide a safe place to work at Drill Rig 141 worksite.

The Court has also take[n] judicial notice, in the following instruction, of certain statutory and regulatory provisions. You may look to such statutory and regulatory provisions as a more particular definition of such duty in determining whether or not the defendant exercised reasonable care under the circumstances.

If you find, more likely than not, that the defendant breached this duty to provide a safe place to work, and that such breach was a proximate cause of the deceased's death, then you must find that the defendant was liable, in whole or in part for the deceased's death, and you must further award plaintiff money which will reasonably and fairly compensate the beneficiaries for their losses resulting from the death of the deceased.

INSTRUCTION NO. 26

The court has taken judicial notice of the following statutes and regulations:

A.S. 18.60.075. SAFE EMPLOYMENT.

(a) an employer shall do everything necessary to protect the life, health and safety of employees including, but not limited to:

(1) complying with all occupational safety and health standards and regulations promulgated by the department;

(2) furnishing and prescribing the use of suitable protective equipment, safety devices and safeguards as are prescribed for the work and work place;

(3) adopting and prescribing control or technological procedures, and monitoring and measuring employee exposure in connection with hazards, as may be necessary for the protection of employees; and

(4) furnishing to each of his employees employment and a place of employment which are free from recognized hazards which, in the opinion of the commissioner, are causing or are likely to cause death or serious physical harm to his employees.

THE ALASKA OCCUPATIONAL SAFETY AND HEALTH STANDARDS SUBCHAPTER 8—PETROLEUM CODE

08.100 Purpose and Scope.

(a) This subchapter sets forth the occupational safety and health standards adopted by the commissioner of labor for the purpose of providing those engaged in the Alaskan petroleum industry with healthful and safe places in which to work.

(b) The standards adopted herein apply to all petroleum industry operations in the state of Alaska, including, but not limited to, production, refining, transportation, handling, and storage except operations involving offshore oil platforms which are under the jurisdiction of the Federal Occupational Safety and Health Administration.

SUBCHAPTER 1—GENERAL SAFETY CODE

§ 01.0102 Employer Requirements.

(a) The employer shall furnish to each of his employees, employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees. This shall be implemented by the employer by complying with these regulations.

(b) The employer shall initiate and maintain accident prevention programs and programs for the prevention of occupational illness and disease as may be necessary to comply with the regulations in this section.

10. O'Neill argued at trial and on appeal that sections of the Restatement (Second) of Agency provide a common law duty running to Par-

der § 414 we have held that such a duty may extend to a general contractor to act for the protection of the employees of a subcontractor.[11] *Moloso v. State,* 644 P.2d 205, 211 (Alaska 1982); *Everette v. Alyeska Pipeline Service Co.,* 614 P.2d 1341, 1347 (Alaska 1980); *Morris v. City of Soldotna,* 553 P.2d 474, 478 (Alaska 1976); *Hobbs v. Mobil Oil Corp.,* 445 P.2d 933, 934 (Alaska 1968). We have also held that § 324A prescribes an assumed duty to act, analytically similar to the duty recognized under § 414.[12] *Hammond v. Bechtel Inc.,* 606 P.2d 1269, 1277 n. 14 (Alaska 1980). Section 324A provides that one may voluntarily assume the responsibility to act for the protection of others. *Adams v. State,* 555 P.2d 235, 240–41 (Alaska 1976); *see also Wallace v. State,* 557 P.2d 1120 (Alaska 1976).

Section 414 subjects "[o]ne who entrusts work to an independent contractor" to the same liability the independent contractor would have for "physical harm to others." This occurs when one "retains control of any part of the work" performed by the independent contractor. Under § 414 the relevant inquiry is thus whether Parker retained control of the work done by O'Neill.

Parker contends that § 414 cannot be used to impose a duty upon one subcontractor for the protection of the employees of another subcontractor. The thrust of Parker's argument is that § 414 "does not create a common law duty" at all.

■ The general rule in tort law is that an employer is vicariously liable for the torts of its employees committed in the scope of employment. Prosser on Torts § 70, at 460–61 (4th ed. 1971). An exception to the rule of vicarious liability has been created for the employer of an independent contractor. Because such an employer normally does not control the work of the independent contractor, he is not held liable for the torts of the contractor and its employees. This exception is sometimes called the "independent contractor rule." *Hammond v. Bechtel,* 606 P.2d at 1274 n. 7.

The independent contractor rule is itself subject to exceptions. Prosser on Torts § 71, at 468 (4th ed.); Restatement (Second) of Torts §§ 410–429 (1965). Section 414 has been characterized as one such exception. *Hammond v. Bechtel,* 606 P.2d at 1274 n. 7; *United States v. Cline,* 410 F.2d 1337, 1342 (9th Cir.1969).

Parker argues that the narrow effect of § 414, when its requirements are satisfied, is to reimpose the rule of vicarious liability between employer and hired contractor despite the independent contractor rule. Because no vicarious liability normally extends to one subcontractor for the actions of another subcontractor, Parker believes that § 414 has no bearing upon the instant case.

Two responses to Parker's argument appear from the briefs and record. First, as appellee points out, this court has demonstrated a dissatisfaction with strict privity limitations in resolving questions of jobsite liability. In *State v. Marathon Oil,* 528 P.2d 293 (Alaska 1974), and *Bachner v. Rich,* 554 P.2d 430 (Alaska 1976), we held that provi-

ker for employees on its worksite. Appellee's argument is unsupported by case authority and was rejected by the superior court on this ground.

11. Section 414 provides:

*Negligence in Exercising Control Retained by Employer*

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

12. Section 324A provides:

*Liability to Third Person for Negligent Performance of Undertaking*

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

sions of the Alaska General Safety Code (GSC) described a duty on the part of an employer to provide a safe worksite not only for its own employees, "but for all employees who may be on their premises." *Bachner*, 554 P.2d at 444; *Marathon Oil*, 528 P.2d at 297.

Second, it is not at all clear that § 414 operates merely as an exception to an exception, as Parker has argued. We have referred to § 414 as the source of an independent duty. Most recently, in *Moloso v. State*, 644 P.2d 205, 211 n. 5 (Alaska 1982), we held that § 414 embodied "the simple rule that anyone, including the employer of an independent contractor, may be held liable for his or her *own* negligence." (Emphasis in original.) In *Hammond v. Bechtel*, 606 P.2d at 1274, we spoke of § 414 as a "source of . . . independent responsibility."

The view that § 414 has been accepted as an independent source of duty is strengthened by our reference in *Bechtel* to the analytical similarity of the analysis under § 414 and the appropriate inquiry under § 324A. 606 P.2d at 1277 n. 14. We stated that the invocation of § 414 was similar to a finding that the defendant "had voluntarily assumed a common law duty by its affirmative conduct." *Id.* In *Bechtel*, as in this case, the defendant's "affirmative conduct" was its retention of control over the worksite.

■ Based on the foregoing we affirm the superior court's determination that there is a common law duty to provide a safe worksite running to whomever supplies and controls that worksite. This duty protects all workers on the site and not just the employees of the defendant. The duty is not dependent upon the existence of any particular combination of contractual relationships.

The next portion of Parker's argument centers upon the superior court's application of § 414 principles in directing a verdict on the issue of retained control in favor of the plaintiff. Parker contends that it exercised

no control over the manner in which O'Neill and other Weatherford employees performed their jobs, and thus this issue was improperly resolved in O'Neill's favor.

■ The question of whether a party exerted sufficient control over the jobsite to bring into play § 414 is one of fact normally left to the jury. *Moloso*, 644 P.2d at 212; *Everette*, 614 P.2d at 1347. Where rational minds could not disagree, however, this factual issue is subject to disposition on directed verdict. *Morris v. City of Soldotna*, 553 P.2d 474, 478–79 (Alaska 1976). The superior court based its directed verdict on the following undisputed facts: (1) Parker owned the drilling rig; (2) Parker provided the stabbing board; (3) Parker's employee ran the drilling operation and the traveling block; (4) Parker's driller was directly responsible for safety and supervision at Rig 141; (5) The driller's immediate superior, the toolpusher, also responsible for safety, was also a Parker employee.[13]

Given the foregoing, we conclude that the superior court was correct in directing a verdict. In *Moloso* we held that a defendant who "retains the right to direct the manner of the independent contractor's performance, or assumes affirmative duties with respect to safety," has retained sufficient control to be held liable if he negligently exercises that control. 644 P.2d at 211. *See also Everette*, 614 P.2d at 1347; *Bechtel*, 606 P.2d at 1275; *Hobbs*, 445 P.2d at 934. In contrast, "[i]f the employer reserves and exercises only the right to inspect the construction work . . . while the independent contractor controls how and when the work is to be done, there is probably not sufficient retained control to subject it to liability." *Moloso*, 644 P.2d at 211, citing *DeVille v. Shell Oil Co.*, 366 F.2d 123, 125 (9th Cir.1966). *See* Restatement (Second) of Torts § 414 comments a and b (1965). We hold that Parker's control over the activities at Rig 141 and of the instrumentalities of Thomas O'Neill's accident was very nearly complete, and was certainly sufficient meaningful control to subject Parker to liability under the accepted stan-

---

**13.** Parker's counsel conceded all of these facts at trial.

dard for § 414 cases. There was no error on the part of the superior court in directing a verdict on this issue.

## II. Evidence Claims.

The remaining three arguments raised by Parker relate to evidence rulings made by the superior court with respect to the admission of testimony and exhibits. The standard of review as to the specifications of error is whether the superior court committed an abuse of discretion.[14]

### A. *Exclusion of testimony of Weatherford's negligence.*

■ Parker argues that the superior court committed reversible error in refusing to admit evidence relating to the responsibilities of Weatherford, O'Neill's employer, for on-the-job safety. Parker attempted to introduce the testimony of Weatherford manager Rodney Baxter as well as a citation issued to Weatherford by the State Division of Occupational Safety and Health (DOSH). In its offer of proof Parker stated that the DOSH citation was issued to Weatherford for unsafe conditions resulting in Thomas O'Neill's death. Baxter would have testified that Weatherford was fined and paid the fine. Parker asserts that this evidence tended to show that Weatherford has assumed "sole responsibility" for work done by its employees.

In our view Parker mischaracterizes the ruling made by the superior court. The superior court stated that it would admit evidence that tended to show that Weatherford and not Parker had retained control and responsibility for safety on the jobsite. In fact, the superior court allowed testimony by Baxter to the effect that Weatherford and its employees had responsibility for their own safety. The court also allowed testimony, over objection, that Weatherford had been hired by ARCO in part because of its expertise relative to job safety. The superior court refused, however, to admit evidence of negligence on Weatherford's part.[15] Thus, the superior court ruled that the offered Baxter testimony and exhibit were irrelevant. We hold that in these circumstances the superior court did not commit an abuse of discretion in the exclusion of this evidence.

### B. *Admission of expert testimony.*

■ Parker claims that the testimony of O'Neill's expert witness Leslie Ball was "irrelevant to any issue in the case" and should have been excluded under Evidence Rule 703. Parker contends that Ball's testimony described the "ideal safety program" and did not speak to the issue of reasonable and ordinary care.[16] Further, Parker ar-

---

**14.** *Bailey v. Lenord,* 625 P.2d 849, 854 (Alaska 1981); *Babinec v. State,* 586 P.2d 966, 968 (Alaska 1978); *D.H. v. State,* 561 P.2d 294, 297 (Alaska 1977); *Bachner v. Rich,* 554 P.2d 430, 446 (Alaska 1976); *Poulin v. Zartman,* 542 P.2d 251, 260 (Alaska 1975), *rehearing,* 548 P.2d 1299 (1976); *Courtney v. Courtney,* 542 P.2d 164, 167 (Alaska 1975); *Davis v. Chism,* 513 P.2d 475, 479 (Alaska 1973).

**15.** It is not disputed that Parker's liability cannot be reduced by any concurrent fault attributable to Weatherford. *See City and Borough of Juneau v. Alaska Electric Light & Power Co.,* 622 P.2d 954, 956 n. 3 (Alaska 1981); *State v. Wien Air Alaska, Inc.,* 619 P.2d 719, 720 (Alaska 1980) ("the liability of a third party defendant cannot be reduced proportionately by the negligence attributable to the plaintiff's employer"); *Arctic Structures, Inc. v. Wedmore,* 605 P.2d 426, 435 (Alaska 1979) (upholding rule of joint and several liability).

**16.** Parker also asserts that Ball's testimony "was theoretical and unrelated to the standard

of care required of Parker," was "totally irrelevant," was "unrelated to the duty at issue," and tended to suggest that Parker was "generally negligent" rather than guilty of specific negligent acts with a causal connection to the accident. Our review of the record has persuaded us that Parker's characterizations of Ball's testimony are inaccurate.

Ball testified that seven "hazardous equipment conditions" and four "hazardous human acts" were the "direct causes" of the O'Neill accident. His broad description of the cause of the accident was "block impact cable break." The seven hazardous equipment conditions alluded to by Ball were as follows:

(1) The proximity of the path of the traveling block to the stabbing board platform.

(2) The absence of a deflector plate beneath the stabbing board.

(3) The lack of a communications system by which a danger signal from the stabber could reach the driller.

(4) The use of a cable which was too weak to support the stabbing board under stress.

gues that the force of Ball's testimony was that a large company such as Parker should be held to a higher standard of care than a smaller company. Similarly, Parker attacks Ball's statement that Parker was grossly negligent in designing and building its own stabbing board instead of purchasing a commercially-available stabbing board.[17] Parker argues that it was under no duty "to provide the best or safest ... piece of equipment."

Again, Parker's description of the record is inaccurate. Leslie Ball testified that the safety programs he described represented the minimum level of reasonable care for an employer utilizing "life depending equipment." O'Neill's counsel stated at trial that O'Neill was not arguing that Parker had a duty to provide state-of-the-art equipment, or was under any special duty due to its large size. On cross-examination Ball rejected the suggestion by Parker's counsel that he believed a large employer had a higher responsibility for safety than smaller companies. Review of Ball's testimony persuades us that Ball's expert opinions were addressed to the issue of the standard of reasonable care applicable to any employer supplying and controlling a drill rig and stabbing board such as found at Rig 141. Ball's references to other practices in the

industry, to alternatives available to Parker but not used, to his view of the requirements of a reasonable safety program, and to the commonly used principles of human factor engineering, were all facets of his expert opinion relating to the appropriate duty of care in this case.

In *Bachner v. Rich,* 554 P.2d 430, 446 (Alaska 1976), it was held that testimony of an expert witness "concerning better methods which [the defendant] might have utilized" could be relevant to the reasonableness of the defendant's conduct. An important limitation upon this "better methods" rule is that the improvements suggested by the expert must be related to defects actually alleged by the plaintiff. Relying upon *Bachner,* the superior court ruled that Ball's testimony would be admitted so long as it was addressed to specific conditions that had caused Thomas O'Neill's accident.

Leslie Ball's testimony was addressed in its entirety to elements of negligence alleged against Parker in O'Neill's complaint. We find no abuse of discretion in the admission of this testimony.

## C. Limitation of cross-examination of O'Neill's expert.

Finally, Parker claims that the superior court erroneously curtailed the scope of

---

(5) The presence of a knot in the cable, further contributing to its weakness.
(6) The absence of a lifeline tied to the stabber.
(7) The absence of automatically-engaging "dogs" to stop the platform from free-falling.
The four hazardous human acts were as follows:
(1) The failure of Parker's driller to shut down the unsafe operation.
(2) The failure of Parker's regional safety supervisor to shut down the operation.
(3) The act of Parker's toolpusher of assigning a driller who had no depth perception.
(4) The act of the driller in operating the rig too fast.
Ball also testified that the "human factor engineering" on Rig 141 was "terrible." Ball explained that human factor engineering is the study of human behavior with respect to equipment and working environment, and the attempt to modify conditions in the workplace to eliminate "induced human errors." Certain human errors can be predicted, and it is the job of the human safety engineer to design equipment

that will not be misused due to a foreseeable employee error. In the instant case, Ball's chief objection to the Rig 141 stabbing board was that the safety handle could be manually overridden, and that use of the device when not overridden impaired productivity. *See supra* note 5. Ball testified that a cardinal principle of human factor engineering was that safety should not involve a tradeoff with the worker's productivity, if the worker is free to choose between the safe and the more productive modes of operation. Ball testified that an adequate safety program implemented by Parker would have addressed the hazardous conditions present at Rig 141 and reduced the chances of the occurrence of Thomas O'Neill's accident.

**17.** Ball's exact words were:
The decision not to buy a commercially available platform that had been developed to make it possible to have productivity and safety together, as opposed to developing your own, I think that was—really showed a reckless disregard for the safety of the people who were going to use it.

Parker's cross-examination of Leslie Ball. In establishing his credentials as an expert witness Ball testified that he had worked as a safety engineer for NASA. Ball revealed on cross-examination that he had been involved with an investigation of the Apollo spacecraft fire that claimed the lives of three astronauts. Parker's counsel began a line of questioning to determine the scope and cost of the NASA safety program which had failed to prevent the fire. Parker's intent was to discredit Ball's testimony by demonstrating that even highly sophisticated safety programs do not eliminate accidents. The superior court sustained O'Neill's objection that the history of the NASA accident was not relevant to this accident.

Parker argues that "great latitude should be granted in the cross-examination of an expert witness." Alaska Rules of Evidence 703 and 705 permit an expert to testify regarding an opinion without first establishing a factual foundation. Parker claims that its inability to question Ball about the NASA program might well have affected the verdict.

This court has adhered to the rule that the trial court possesses broad discretion with respect to the exclusion of expert testimony, even when ruling upon the scope of cross-examination. *Babinec v. State*, 586 P.2d 966, 968 (Alaska 1978). Parker presents a persuasive argument that this discretion should be curtailed when cross-examination is cut short. But Parker's questioning of Ball on the particular circumstances of the NASA investigation was clearly irrelevant to the O'Neill accident. As a logical proposition it is incorrect to say that the fact of one NASA accident demonstrates that safety engineering does not reduce the incidence of accidents.

■ Even if the superior court did err on this point, we do not perceive any prejudice suffered by Parker.[18] Parker's counsel remained free to pursue the subject of the general effectiveness of safety procedures. The superior court's ruling was merely that

the details of the NASA accident could not be developed. Parker could have continued its questioning along broader lines.

III. Claims on cross-appeal.

The jury found that Thomas O'Neill's own negligence was 30% responsible for his accident. On cross-appeal, Melneeta O'Neill argues that there was no evidence at trial that Thomas O'Neill had committed any negligent act or omission. She also argues that there was no evidence that any action of O'Neill's proximately caused his fatal accident. Finally, she claims that, even if O'Neill was contributorily negligent, there should still be no comparative reduction of the damage award because O'Neill's negligence should have been anticipated by Parker. Melneeta O'Neill thus contends that a directed verdict should have been rendered in her favor on the issue of comparative negligence and that the 30% reduction of the award against Parker should be stricken.

■ Cross-appellant's arguments regarding the lack of evidence on the questions of Thomas O'Neill's contributory negligence and proximate cause are devoid of merit. There was evidence at trial that Thomas failed to use the safety handle on the stabbing board, that its purposes as a safety device would have been obvious to any experienced stabber, and that the proper use of the safety handle might well have prevented his death. Furthermore, there was evidence that O'Neill's failure to protest the unsafe conditions on Rig 141 or to refuse to work were themselves negligent omissions. The superior court correctly ruled that the issue of O'Neill's negligent contribution to his own death was the subject of rational disagreement.

Cross-appellant's second argument is that as a matter of policy injured workers should not be held responsible for their acts of negligence which should have been predictable to an employer. In *Bachner v. Rich*, 554 P.2d 430, 438 (Alaska 1976), we summarily rejected the argument "that the de-

---

**18.** *Love v. State*, 457 P.2d 622 (Alaska 1969).

fense [of contributory negligence] should be denied because the injured employee is rarely able to protect himself from unsafe working practices." *See Krall v. Royal Inns of America, Inc.,* 374 F.Supp. 146 (D.Alaska 1973). We therefore hold that the issue of Thomas O'Neill's comparative negligence was properly submitted to the jury.

The judgment below is AFFIRMED.

BURKE, C.J., and MOORE, J., not participating.