Kenneth M. DAHLE, and Betty Dahle, Appellants,

v.

ATLANTIC RICHFIELD COMPANY, a foreign corporation, Appellee.

No. S–315.

Supreme Court of Alaska.

Sept. 26, 1986.

---

John W. Hendrickson, Anchorage, Barry W. Jackson, Fairbanks, for appellants.

Dennis M. Bump, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

RABINOWITZ, Chief Justice.

## OPINION

Kenneth and Betty Dahle brought an action for damages against Atlantic Richfield Company (ARCO) after Kenneth Dahle was injured in an industrial accident. In their complaint, the Dahles alleged that Kenneth Dahle's injuries were proximately caused by ARCO's negligence. ARCO denied liability and a jury returned a special verdict in favor of ARCO, finding that ARCO owed no duty of care to Kenneth Dahle. Following the superior court's denial of their motion for a new trial and entry of a final judgment, the Dahles appealed.

## I. FACTS AND PROCEEDINGS BELOW

Kenneth Dahle operates heavy equipment. On the date of his injury, Dahle was working at Prudhoe Bay for Pioneer Oilfield Services, Inc. (Pioneer), an independent labor and equipment contractor. Pioneer had contracted with ARCO to provide "labor, ... equipment, supplies and material necessary or appropriate to the performance of any work ordered by [ARCO]." Dahle was injured while clearing snow from one of ARCO's drilling pads on property leased to ARCO by the North Slope Borough.

On the morning of the accident, as on each of the previous several days, Pioneer instructed Dahle to report to ARCO's base camp for dispatch. Following his arrival at the base camp, Dahle was ordered by ARCO's equipment dispatcher, Bill Rice, to plow snow on a road leading to the beach, about five miles from the base camp. After working at that location for an hour or two, Dahle was instructed to return to ARCO's base camp for a new assignment; because of the heavy snowfall, ARCO abandoned its efforts to clear the road. Dahle returned to the base camp, as instructed, and again contacted Bill Rice.

Rice next ordered Dahle to remove accumulated snow from ARCO's drilling pads, using a front-end loader belonging to ARCO. Pursuant to Rice's orders, and aided by a map prepared for him by Rice,

Dahle drove the front-end loader from ARCO's base camp to the new work site and began clearing snow. The accident occurred shortly thereafter, while Dahle was removing snow from pad number 12. Dahle was injured when the bucket on the front-end loader struck an object in the snow, abruptly stopping the loader and hurling Dahle into the windshield.

The object that Dahle struck was a "rat hole," placed on the pad during a recent drilling operation. A rat hole is formed by a piece of heavy pipe buried in the ground,[1] and is used in the drilling process. At the time of the accident, oil field technology required a rat hole at the site of every well. It is undisputed that rat holes should not extend above ground level, and that they are dangerous if they do. To avoid this danger, the standard industry practice is to cut off that portion of any rat hole extending above ground level after completion of drilling. In Dahle's case this had not yet been done.

The well near the rat hole had been drilled by Parker Drilling Company (Parker), also an independent contractor. Assisting Parker in the drilling operation was another independent contractor, Veco, Inc. (Veco). Veco's responsibility was to prepare the site prior to the arrival of Parker's drill rig and to clean up after Parker's departure. Normally, the cleanup operation would include cutting off any rat hole left after drilling was completed. Although Parker had removed its drill rig prior to the accident, evidence at trial suggested that the drilling and cleanup operations were not yet complete.

At trial, ARCO defended in part upon the ground that it owed no duty of care to Dahle. In essence, ARCO claimed that the rat hole should have been cut off by either Pioneer or one of the other independent contractors, and that under its contracts with Pioneer, Parker and Veco, ARCO did not control the activities creating the risk to Dahle. ARCO argued that Dahle was injured because his employer, Pioneer, had failed to perform its duty under its contract with ARCO. This contract provided in part:

[Pioneer], before starting work, shall make a thorough inspection of the work site to determine the difficulties and hazards incident to the performance of the work. [Pioneer] agrees to perform the work with due diligence and in a good and workmanlike manner. [Pioneer] shall provide continuous adequate protection of the work, [and ARCO's] property and adjacent property, and take all necessary precautions for the safety of all persons and employees on the work, including employees of [ARCO], and comply and cause [Pioneer's] employees and agents and others entering on [ARCO's] premises in the performance of the work or in connection therewith to comply with all safety rules of [ARCO] and applicable provisions of federal, state or local safety laws, rules or regulations necessary to prevent damage or injury to any and all property and persons.

The superior court submitted the question of ARCO's duty to the jury, with specific instructions on (1) the duty owed by an employer of an independent contractor to the independent contractor's employees and (2) the duty of an owner or occupier of land to persons who might be harmed by dangerous conditions on the land.

Accompanying the court's instructions was a verdict form upon which the jury returned its special verdict. In response to the first question appearing on the form— "Did Atlantic Richfield owe any duty of care to Kenneth M. Dahle?"—the jury answered, "No." As it was instructed to do in that event, the jury answered no further questions.

Prior to entry of a final judgment, the Dahles moved for a new trial, arguing that the jury's verdict was against the weight of the evidence. Their motion was denied. Thus, judgment was entered solely upon

---

1. More specifically, a "rat hole" is a hole surrounded by very thick pipe, is 13⅞ inches in diameter, 27 feet deep, and is set at a 15° angle.

the jury's determination that ARCO owed no duty of care to Kenneth Dahle. This appeal followed.

## II. DUTY ARISING FROM "RETAINED CONTROL"

██ Generally, an employer of an independent contractor owes no duty to the independent contractor's employees to protect those employees from the negligence of their own master. *Moloso v. State*, 644 P.2d 205, 210 (Alaska 1982). The evidence established that Pioneer, Parker and Veco were all independent contractors. Thus, ARCO would only be liable for its own negligence, a breach of a duty of care owed to Dahle by ARCO itself. An employer such as ARCO owes the employees of an independent contractor the duty to avoid endangering them by the employer's own negligent acts or omissions. *Id.* (citing *Sloan v. Atlantic Richfield Co.*, 552 P.2d 157, 160 (Alaska 1976)). Thus, when an employer of an independent contractor "retains control" of part of the work, liability may attach.

We have expressly adopted the retained control principle. *Moloso*, 644 P.2d at 211 (footnote omitted). Section 414 of the Restatement (Second) of Torts (1965) states:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

The issue determined at trial was whether ARCO retained sufficient control over the work it had contracted to have done by others, to give rise to a duty of care to Dahle on the date of the accident.

In reviewing the superior court's denial of Dahle's motion for a new trial, we must determine "whether 'the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make

the verdict plainly unreasonable and unjust.'" *Sloan v. Atlantic Richfield Co.*, 541 P.2d 717, 724 (Alaska 1975), *vacated on other grounds*, 552 P.2d 157 (Alaska 1976) (quoting *Ahlstrom v. Cummings*, 388 P.2d 261, 262 (Alaska 1964)). While ARCO retained a moderate degree of control over the work it contracted to have Pioneer perform, we cannot say as a matter of law that the evidence as to ARCO's lack of control was so slight and unconvincing as to make the verdict plainly unreasonable and unjust.

██ Both contractual provisions relating to control and the actual exercise of control are relevant in determining whether the nature and extent of the retained control is sufficient to warrant imposition of liability. *Moloso*, 644 P.2d at 211. The evidence presented at trial did not clearly indicate who controlled Dahle's workplace at the time of the accident.[2] ARCO contended that Parker controlled the workplace, while the Dahles contended that ARCO controlled it.

It is undisputed that Dahle's accident occurred on pad number 12, well number 8, in Prudhoe Bay, on property ARCO leases from the North Slope Borough. The accident occurred when Dahle was operating a "966 front-end loader" owned by ARCO, to clear snow from well number 8. The loader came to a sudden stop, and Dahle was hurled against the windshield, suffering personal injuries. The loader stopped when it struck a protruding rat hole.

At the time of the accident, there was a rat hole at every well. Someone had the duty to cut off the rat hole at the well where Dahle's accident occurred, but it is not clear from the record whose duty it was nor if and when that duty ripened.

ARCO hired assorted companies to assist it in various phases of its oil collection process. Three such companies, Pioneer, Veco, and Parker were involved here. Witnesses at trial testified that Parker had responsibility for drilling the wells, and

---

**2.** The ARCO-Veco and ARCO-Parker contracts were not submitted into evidence at trial, thus making it more difficult to ascertain who was responsible for initiating clean-up activities at a well site, and how much control of the sites ARCO in fact retained.

Veco had responsibility both for pad preparation before drilling, support work during drilling, and clean up after the Parker rig moved off. A Veco witness testified that Veco had almost the exclusive drilling support contracts at that time. Sometime after the Parker rig would leave, ARCO would bring the new well into production. Pioneer was a general contractor of labor and equipment, available to ARCO for work at any time, for however long ARCO desired it. According to ARCO employees, Pioneer worked for the ARCO maintenance division and did the same type of work that Veco did. Dahle was employed by Pioneer at the time of the accident.

The evidence at trial indicated that well number 8 was not yet developed to the point of production. The Parker rig had recently completed its work at the well and had been moved, but Veco had not yet conducted its clean-up of the site. Witnesses testified that Parker would, pursuant to its contract with ARCO, cut off the rat hole after it completed drilling if it had time. Otherwise, Veco, pursuant to its contract with ARCO, would usually perform that task during its clean-up of the site.

ARCO also introduced the Pioneer-ARCO contract, provisions of which required Pioneer to thoroughly inspect the work site for hazards before beginning work, and to provide continuous adequate protection of the work. The contract also provided that work in progress was open to ARCO's inspection, but that Pioneer was the sole supervisor and controller of its employees.

■ From the evidence presented we think the jury could reasonably conclude that work was still in progress at drill site number 12, that Veco had not yet cleaned up, and that production had not yet begun. Based on these facts and the Pioneer-ARCO contract clause in which ARCO delegated responsibility for the work site to the subcontractor, the jury could conclude that ARCO did not have any duty to Dahle. While there was also evidence suggesting that ARCO did retain control over the work site and over Dahle's work, the jury's special verdict finding that ARCO owed Dahle no duty of care is not plainly unreasonable

and unjust since there was evidence in support of the special verdict which cannot be characterized as slight and unconvincing. Therefore, we affirm the superior court's denial of Dahle's motion for a new trial.

## III. NEGLIGENCE PER SE INSTRUCTION

The Dahles contend that the superior court erred in refusing to give their proposed jury instruction on negligence per se. They requested the following instruction at trial:

The Construction Code § 05.030(b)(1)(a), 05.030(g)(1) and General Safety Code § 01.1201 et. seq. have been adopted by this court as the applicable safety standards in this case. If you find that defendant has not conformed to these standards then the defendant is negligent per se and you must find for plaintiffs herein.

■ When violation of a statutory or regulatory provision constitutes negligence per se, that provision supersedes the common law definitions of both duty and standard of care. *See Ferrell v. Baxter*, 484 P.2d 250, 259 (Alaska 1971). In order for a provision to be the basis of a negligence per se instruction, it must set forth a specific standard of conduct beyond that defined in a common law duty. *See Osborne v. Russell*, 669 P.2d 550, 555 (Alaska 1983); *Grothe v. Olafson*, 659 P.2d 602, 607 n. 12 (Alaska 1983). A test for specificity was established in *Bachner v. Rich*, 554 P.2d 430, 442 (Alaska 1976):

[I]f a positive and definite standard of care has been established by legislative enactment whereby a jury may determine whether there has been a violation thereof by finding a single issue of fact, a violation is negligence per se; but where the jury must determine the negligence or lack of negligence of a party charged with the violation of rule of conduct fixed by legislative enactment from a consideration and evaluation of multiple facts and circumstances by the process of applying, as the standard of care, the conduct of a reasonably prudent person, negligence per se is not involved. (Citation omitted.)

The Dahles sought to have the superior court instruct the jury that the Alaska General Safety Code (GSC) § 01.0102(a) establishes the duty and standard of care for ARCO in this case. That provision reads as follows:

> The employer shall furnish to each of his employees, employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees. This shall be implemented by the employer by complying with these regulations.

■ This provision is not a proper basis for a negligence per se instruction because it amounts to little more than a duplication of the common law tort duty to act reasonably under the circumstances.

Recently, in *Parker Drilling Co. v. O'Neill*, 674 P.2d 770 (Alaska 1983), we held that "there is a common law duty to provide a safe worksite running to whomever supplies and controls that worksite. This duty protects all workers on the site and not just the employees of the defendant. The duty is not dependent upon the existence of any particular combination of contractual relationships." *Id.* at 776. This holding was in part based on our prior decisions regarding jobsite liability which determined that the duty of an employer to provide a safe workplace articulated in the GSC extends to all employees on the site. *Id.* (citing *State v. Marathon Oil*, 528 P.2d 293 (Alaska 1974), and *Bachner*, 554 P.2d 430).

Thus, while the GSC may appear to establish a duty upon all employers who have workers on their property, it actually comes into play only after retained control has been established. Retained control was not established in this case, and therefore any duty on the part of ARCO to Dahle did not arise. In any event, the duty established in the general GSC provision is the same as the common law duty to provide a safe workplace, for which an instruction in this case was given.

The Dahles also sought to have the superior court declare that Alaska Construction Code § 05.030(b)(1)(A) establishes the duty and standard of care for ARCO in this case. That provision provides:

> The employer shall furnish to each of his employees, employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees. The employer shall comply with these regulations.

For the same reasons described above, it was proper for the superior court to decline to use a negligence per se instruction based upon this provision.

## IV. ATTORNEY'S FEES AND COSTS

The Dahles have two points of contention with respect to the award of attorney's fees and costs to ARCO; they argue that the attorney's fee award was excessive and that it was improper for the superior court to award a "client per diem" cost item.

ARCO requested a total of $92,250.00 in attorney's fees. It claimed that the actual attorney's fees it had incurred were $123,-132.50. The superior court awarded $55,-000.00, which amounts to approximately 60% of the requested amount and 45% of the alleged actual fees incurred.

ARCO argued the high award was justified on three grounds. First, it noted that a major portion of attorney time was expended on damages. ARCO contended that much of its time preparing for the thirteen-day trial was spent refuting Dahle's contrived damage claims. Second, it contended the Dahles rejected its reasonable offer of judgment, made approximately a year before final judgment, and that much of the fees could have been spared had the Dahles accepted the offer. Finally, ARCO argued that the Dahles sought $1.7 million dollars in damages, and had they prevailed they would have been entitled to $170,000.00 in attorney's fees.

The Dahles opposed the requested fee award, claiming Dahle's injuries and the source of those injuries were presented in good faith, and arguing that a large award of attorney's fees would have a chilling effect on personal injury litigants. The Dahles admit that an offer of judgment was made, but contend that it was inadequate.

In its order awarding attorney's fees, the superior court made the following findings:

> The Court finds that the majority of attorney's time spent on this case was in the area of damages. A considerable amount of the defendant's time was spent responding to misleading and deceptive information provided by the plaintiff. Had Mr. Dahle been forthright in his testimony much of this expenditure of time would have been avoided.[3]

■ The superior court's award of attorney's fees under Alaska Civil Rule 82(a) will not be reversed unless we find there has been clear abuse of discretion, such that the court's determination is manifestly unreasonable. *Gold Bondholders Protective Council v. Atchison, Topeka and Santa Fe Railway Co.*, 658 P.2d 776, 778 (Alaska 1983); *Adoption of V.M.C.*, 528 P.2d 788, 795 (Alaska 1974). In the past, this court has sustained attorney's fees awards of greater than 45% of the fees incurred and 60% of the fees requested. *Brunet v. Dresser Olympic Division of Dresser Industries, Inc.*, 660 P.2d 846, 847–48 (Alaska 1983) (award of $6,000 out of $9,818.50 in actual fees); *State v. Fairbanks North Star Borough School District*, 621 P.2d 1329, 1334–35 (Alaska 1981) (award of $37,000 where $22,000 had been requested and $57,000 had been incurred); *Hausam v. Wodrich*, 574 P.2d 805, 811 (Alaska 1978) (award of $9,680.62, constituting 86% of actual fees).

■ While the attorney's fees award in this case is high, we do not find it to be so unreasonably high as to amount to an abuse of discretion.

The Dahles also object to a portion of the costs awarded to ARCO. The superior court awarded $993.97 as per diem expenses for a representative of ARCO to sit through trial. The court based the client per diem award on Alaska Civil Rule 79, which it held authorizes "expenses necessarily incurred in order to enable a party to secure some right accorded him in the action or proceeding."

■ The Dahles object to the client per diem on the ground that an individual plaintiff or defendant does not receive a per diem and there is no reason to grant it to a corporate entity. We agree. There is no indication that the ARCO representative performed the function of an expert witness or of an attorney. An ordinary plaintiff or defendant would not be entitled to lost wages for time taken from work to attend a trial Attending trial is simply an inconvenience of litigation; it is not a compensable cost.[4]

AFFIRMED in part and REVERSED in part.

BURKE, Justice, dissenting.

I dissent.

It is undisputed that ARCO exercised substantial actual control over both the work site and the work performed by Kenneth Dahle at the time of the accident. On the date of the accident, as on each of the previous several days, Dahle received his

---

**3.** The superior court explained its finding in more detail during argument on attorney's fees:

> I do not feel that—that your client [Mr. Dahle] was candid with the court or the jury. If he was, he has some of the most unusual injuries in that they come and go and are usually gone when somebody is taking a movie of him. I mean he can't walk, he—he's almost a basket case and yet he's pretty ambulatory when people aren't watching him, and I don't think there's any question about that.

**4.** We affirm the superior court on the following issues, which do not merit extensive discussion. The superior court did not err in failing to give the Dahles' proposed agency instruction, as it would have been confusing to the jury. The court properly refused evidence relating to OSHA Reg. 29 CFR 1926.16 because OSHA does not apply to cases where the worker is not an employee of the entity or person against whom recovery is sought. *Jeter v. St. Regis Paper Co.*, 507 F.2d 973, 976–77 (5th Cir.1975); *Cochran v. International Harvester Co.*, 408 F.Supp. 598, 602 (W.D.Ky.1975). The Dahles were not entitled to summary judgment because they never filed a summary judgment motion. The superior court did not abuse its discretion in refusing to admit the statement made by Bill Rice, because its probative value was outweighed by the danger of misleading the jury. Alaska R.Evid. 403. The Dahles' contention that two contracts should not have been admitted is meritless; one was never admitted and no objection was made to the other. Further, our holding as to the duty—new trial issue makes it unnecessary to address Dahle's contentions relating to the supe-

specific work orders from ARCO, after he arrived at ARCO's base camp. His orders, in this instance, were to remove snow from ARCO's drilling pads, including the pad upon which the accident occurred, using a front end loader supplied by ARCO. These orders were given to Dahle by Bill Rice, ARCO's equipment dispatcher.

When the employer of an independent contractor exercises substantial actual control over the details of the work, determining how and when the work will be done, the employer must use reasonable care in the exercise of that control. *Moloso v. State*, 644 P.2d 205, 210–14 (Alaska 1982). Given the undisputed evidence in this case, I would hold that ARCO owed a duty of care to Kenneth Dahle as a matter of law. Thus, I would reverse and remand this matter to the trial court upon the ground that the jury's verdict was contrary to the clear weight of the evidence. I express no opinion on any other issue in the case.

rior court's limitation of rebuttal and its refusal to instruct on res ipsa loquitur.